Filed 7/2/18

# IN THE SUPREME COURT OF CALIFORNIA

DAWN L. HASSELL et al., )
)
      Plaintiffs and Respondents, )
)             S235968
v. )
)     Ct.App. 1/4 A143233
AVA BIRD, )
)     San Francisco County
      Defendant; )   Super. Ct. No. CGC 13530525
)
YELP INC., )
)
      Objector and Appellant. )
_____)

       In this case, we consider the validity of a court order, entered upon a default judgment in a defamation case, insofar as it directs appellant Yelp Inc. (Yelp) to remove certain consumer reviews posted on its website. Yelp was not named as a defendant in the underlying lawsuit, brought by plaintiffs Dawn Hassell and the Hassell Law Group, and did not participate in the judicial proceedings that led to the default judgment. Instead, Yelp became involved in this litigation only after being served with a copy of the aforementioned judgment and order.

       Yelp argues that, to the extent the removal order would impose upon it a duty to remove these reviews, the directive violates its right to due process under the federal and state Constitutions because it was issued without proper notice and an opportunity to be heard. Yelp also asserts that this aspect of the order is invalid under the Communications Decency Act of 1996, relevant provisions of which

SEE CONCURRING & DISSENTING OPINIONS

(found at 47 U.S.C. § 230, hereinafter referred to as section 230)[1] relate, "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider" (§ 230(c)(1)), and "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section" (§ 230(e)(3)).

The Court of Appeal rejected Yelp's arguments. We reverse. The Court of Appeal erred in regarding the order to Yelp as beyond the scope of section 230. That court reasoned that the judicial command to purge the challenged reviews does not impose liability on Yelp. But as explained below, the Court of Appeal adopted too narrow a construction of section 230. In directing Yelp to remove the challenged reviews from its website, the removal order improperly treats Yelp as "the publisher or speaker of . . . information provided by another information content provider." (§ 230(c)(1).) The order therefore must be revised to comply with section 230.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In June 2012, defendant Ava Bird approached the Hassell Law Group, owned by Dawn Hassell (who is hereinafter referred to as Hassell), to represent her in a personal injury matter. That August, Bird and the law firm entered into a representation agreement. After e-mail exchanges and communication difficulties led Hassell to conclude that Bird was unhappy with the firm's performance, the Hassell Law Group withdrew from representation in September 2012. Hassell notified Bird of this decision via e-mail.

Several months later, on January 28, 2013, a one-star (out of five) review of the Hassell Law Group appeared on Yelp. This website, available to anyone with

---

[1] Subsequent undesignated statutory references are to title 47 of the United States Code.

Internet access, provides a forum for reviews and ratings of businesses and other entities. Individuals with Yelp accounts author the reviews and issue the ratings. Individual reviews and ratings appear on the Yelp website together with the author's Yelp user name and location. A reviewed business may post a public response to a user review; this response will appear directly below the review on Yelp's website. Yelp also combines individual ratings into an aggregate rating for each business.

The one-star review was posted by Yelp user "Birdzeye B." from Los Angeles, California. It provided in full (with the spelling, spacing, capitalization, and punctuation in this and all other quoted reviews per the originals) as follows:

> "well, here is another business that doesn't even deserve one star. basically, dawn hassell made a bad situation much worse for me. she told me she could help with my personal injury case from falling through a floor, then reneged on the case because her mom had a broken leg, or something like that, and that the insurance company was too much for her to handle. and all of this after i met with her office (not her personally, she was nowhere to be found) signed paperwork to 'hire' them and gained confidence in her office (due mostly to yelp reviews) so, in all fairness, i have to share my experience so others can be forewarned. she will probably not do anything for you, except make your situation worse. in fact, after signing all the paperwork with her office, like a broken record, they repeated 'DO NOT TALK TO THE INSURANCE COMPANY' over and over and over. and over and over. so I honored that and did not speak to them. but the hassell law group didn't ever speak with the insurance company either, neglecting their said responsibilities and not living up to their own legal contract! nor did they bother to communicate with me, the client or the insurance company AT ALL. then, she dropped the case because of her mother and seeming lack of work ethic. (a good attorney wont do this, in fact, they aren't supposed to) to save your case, STEER CLEAR OF THIS LAW FIRM! and research around to find a law firm with a proven track record of success, a good work ethic, competence and long term client satisfaction. there are many in the bay area and with some diligent smart interviewing, you can find a competent attorney, but this wont be one of them."

Hassell believed Bird to be the author of this review, and sent her an e-mail. Hassell wrote Bird that "[y]ou are certainly free to write a review about your experience and provide constructive feedback. But slandering someone and intentionally trying to damage their business and reputation is illegal." Disputing statements in the review, Hassell requested that Bird remove or revise it, and wrote that "[i]f you are unwilling to talk to me or respond, I will assume you don't intend to work this out [with] me directly and I will retain a defamation attorney this week to file a legal action against you for slander and defamation." Bird responded with a lengthy e-mail of her own, in which she stated that Hassell would "have to accept the permanent, honest review [I] have given you."

Shortly thereafter, on February 6, 2013, another one-star review of the Hassell Law Group was posted on Yelp. This review was from the user "J.D.," identified as hailing from Alameda, California. It provided in full as follows: "Did not like the fact that they charged me their client to make COPIES, send out FAXES, POSTAGE, AND FOR MAKING PHONE CALLS about my case!!! Isn't that your job. That's just ridiculous!!! They Deducted all those expenses out of my settlement."

On April 10, 2013, plaintiffs filed suit against Bird in San Francisco Superior Court. The verified complaint alleged that Bird wrote both of the previously discussed reviews, that these reviews were libelous, and that in posting the reviews, Bird cast plaintiffs in a false light and intentionally inflicted emotional distress upon Hassell. Plaintiffs sought general, special, and punitive damages, as well as "injunctive relief prohibiting Defendant Ava Bird from continuing to defame plaintiffs as complained of herein, and requiring Defendant Ava Bird to remove each and every defamatory review published by her about plaintiffs, from Yelp.com and from anywhere else they appear on the internet." Yelp was not named as a defendant. At oral argument before this court, counsel

4

for plaintiffs candidly acknowledged that this omission was intentional. Plaintiffs anticipated that if they added Yelp as a defendant and integrated the company into the action at that time, Yelp could respond by asserting immunity under section 230.

After several attempts at personal service failed, plaintiffs effected substitute service. On April 17, 2013, the summons and complaint were left with another individual at the address where Bird was believed to reside. In November 2013, with Bird not yet having appeared in the case, plaintiffs moved for entry of a default judgment. In the interim, "Birdzeye B." had posted on Yelp an "update" of her review of the Hassell Law Group. This update (which henceforth will be described as a review), dated April 29, 2013, provided as follows:

> "here is an update on this review.
> dawn hassell has filed a lawsuit against me over this review I posted on yelp! she has tried to threaten, bully, intimidate, harass me into removing the review! she actually hired another bad attorney to fight this. lol! well, looks like my original review has turned out to be truer than ever! avoid this business like the plague folks! and the staff at YELP has stepped up and is defending my right to post a review. once again, thanks YELP! and I have reported her actions to the Better Business Bureau as well, so they have a record of how she handles business. another good resource is the BBB, by the way."

In a declaration filed in support of the request for a default judgment, Hassell explained that she had connected the January 2013 review to Bird "[b]ased on the poster's user name being similar to Ms. Bird's real name and the details such as 'falling through a floor.' " Hassell also averred that the review from "J.D." had been written by Bird. She further related that since the first of the challenged reviews had been posted, the Hassell Law Group had seen a significant decrease in user activity on Yelp that suggested interest in the firm, and that as a result of this review, its overall Yelp rating had dropped to 4.5 stars.

5

A "prove-up" evidentiary hearing was held on January 14, 2014.[2] Hassell was sworn as a witness and gave testimony at this session. After the hearing, the court entered judgment in favor of plaintiffs, awarding general and special damages and costs totaling $557,918.85. The court also ordered Bird "to remove each and every defamatory review published or caused to be published by her about plaintiffs HASSELL LAW GROUP and DAWN HASSELL from Yelp.com and from anywhere else they appear on the internet within 5 business days of the date of the court's order." The court's order also provides that Bird, and "her agents, officers, employees or representatives, or anyone acting on her behalf, are further enjoined from publishing or causing to be published any written reviews, commentary, or descriptions of DAWN HASSELL or the HASSELL LAW GROUP on Yelp.com or any other internet location or website." Finally, the order states that "Yelp.com is ordered to remove all reviews posted by AVA BIRD under user names 'Birdzeye B.' and 'J.D.' attached hereto as Exhibit A and any subsequent comments of these reviewers within 7 business days of the date of the court's order." Exhibit A includes the January 2013 and April 2013 reviews by "Birdzeye B.," and the February 2013 review by "J.D."[3]

---

[2] In a matter such as the one at bar, upon entry of a default, "[t]he plaintiff thereafter may apply to the court for the relief demanded in the complaint. The court shall hear the evidence offered by the plaintiff, and shall render judgment in the plaintiff's favor for that relief, not exceeding the amount stated in the complaint, . . . as appears by the evidence to be just." (Code Civ. Proc., § 585, subd. (b).)

[3] The Court of Appeal used the term "removal order" to describe only the sentence within the order that explicitly directs Yelp to remove the three reviews. We use this same term to describe the order generally.

6

Yelp was served with a copy of the default judgment later that month.[4]  In response, Yelp's in-house counsel wrote Hassell a letter that identified several perceived deficiencies with the judgment and removal order.  The letter accordingly advised that "Yelp sees no reason at this time to remove the reviews at issue."  The letter added that Yelp reserved the right to revisit this decision if it were to receive additional facts responsive to its concerns.  Hassell was told that if an action were pursued against Yelp premised on its publication of the reviews, Yelp would "promptly seek dismissal of such action and its attorneys' fees under California's anti-SLAPP law."  (See Code Civ. Proc., § 425.16.)  Hassell responded by letter dated April 30, 2014, explaining her position and asking Yelp to reconsider and remove the reviews.

The next month, Yelp filed a motion to set aside and vacate the judgment. In its supporting brief, Yelp argued that to the extent the order to remove the posts was aimed at it, the directive violated Yelp's due process rights, exceeded the scope of relief requested in the complaint, and was barred by section 230. Yelp also argued that Hassell had not given proper notice of the action to Bird, nor connected the challenged reviews to Bird sufficiently to justify an injunction.[5] Yelp requested that the default judgment be set aside and vacated in its entirety, or

---

[4]     In connection with their opposition to Yelp's motion to set aside and vacate the default judgment, plaintiffs supplied documentation indicating that in May 2013, their attorney sent Yelp a facsimile that included a copy of the complaint against Bird, as well as the January 2013 and February 2013 reviews underlying the action.  Counsel's facsimile cover letter concluded with his "expect[ation]" that Yelp would "cause these two utterly false and unprivileged reviews to be removed as soon as possible."

[5]     After not appearing below, Ms. Bird has submitted an amicus curiae brief to this court.  In her brief, Bird acknowledges writing the January 2013 "Birdzeye B." review, but denies authoring the February 2013 review from "J.D."

7

in the alternative, "modified to eliminate all provisions that compel Yelp to act in any manner, or restrain Yelp from engaging in any conduct."

The superior court denied the motion to set aside and vacate the judgment. In its order denying the motion, the court quoted this court's generic assessment that " '[i]n matters of injunction . . . it has been a common practice to make the injunction run also to classes of persons through whom the enjoined person may act, such as agents, servants, employees, aiders, abettors, etc., though not parties to the action, and this practice has always been upheld by the courts.' " (*Ross v. Superior Court* (1977) 19 Cal.3d 899, 906.) The superior court applied this principle to the present case because, in the court's view, there was a "factual basis to support Hassell's contention that Yelp is aiding and abetting Bird's violation of the injunction." As evidence of this aiding and abetting, the superior court noted that "Yelp highlighted at least one of Bird's defamatory reviews by featuring it as a 'Recommended Review,' " that "a litany of favorable reviews are not factored into the Hassell Law [Group]'s star rating, appearing to give emphasis to Bird's defamatory review," that Yelp was moving "to set aside the judgment in its entirety, including the portions of the judgment that pertain only to Bird" and otherwise was advancing arguments "on Bird's behalf," and that "notwithstanding a judicial finding that Bird's reviews are defamatory, Yelp refuses to delete them."

Yelp appealed. It reasserted on appeal that the order, to the extent that it commanded Yelp to remove the challenged reviews, violated the company's due process rights, as well as section 230. (*Hassell v. Bird* (2016) 247 Cal.App.4th 1336, 1341, 1355, 1361.)[6] The Court of Appeal rejected both arguments. It first

---

[6]     The Court of Appeal's opinion also addressed several other issues not encompassed within our grant of review. (See *Hassell v. Bird*, *supra*, 247 Cal.App.4th at pp. 1348-1354.) We express no views regarding the Court of Appeal's analysis of those topics. We likewise have no occasion to opine on

8

found no due process violation in allowing the injunction to run against Yelp.  As had the superior court, the Court of Appeal regarded Yelp as being among the actors to whom the injunction could properly extend, even though it was not a party to the proceedings that led to the injunction.  (*Id*., at pp. 1355-1357.)  The Court of Appeal also found no merit in Yelp's related argument that, regardless of whether an injunction normally can run against nonparties, the injunction here could not properly extend to it because such a reach would unduly limit the dissemination of speech.  The Court of Appeal questioned the premise of this argument, opining that "it appears to us that the removal order does not treat Yelp as a publisher of Bird's speech, but rather as the administrator of the forum that Bird utilized to publish her defamatory reviews." (*Id*., at p. 1358.)  The Court of Appeal also observed that in *Balboa Island Village Inn, Inc. v. Lemen* (2007) 40 Cal.4th 1141, this court ruled that " 'an injunction issued following a trial that determined that the defendant defamed the plaintiff that does no more than prohibit the defendant from repeating the defamation, is not a prior restraint and does not offend the First Amendment.' " (*Hassell v. Bird*, at p. 1360, quoting *Balboa Island*, at p. 1148.)  The Court of Appeal concluded that "[u]nder the authority of *Balboa Island* . . . the trial court had the power to make the part of this order requiring Yelp to remove the three specific statements . . . because the injunction prohibiting Bird from repeating those statements was issued following a determination at trial that those statements are defamatory." (*Id*., at p. 1360.)

Turning to Yelp's section 230 argument, the Court of Appeal recognized that "section 230 has been construed broadly to immunize 'providers of interactive

_____

whether the challenged reviews are in fact defamatory, in whole or in part.  Our analysis assumes the correctness of the superior court's determination on this point.

9

computer services against liability arising from content created by third parties' "
(*Hassell v. Bird*, *supra*, 247 Cal.App.4th at p. 1361, quoting *Fair Housing Coun.,
San Fernando v. Roommates.com* (9th Cir. 2008) 521 F.3d 1157, 1162, fn.
omitted), and that in *Barrett v. Rosenthal* (2006) 40 Cal.4th 33 (*Barrett*), this court
similarly regarded section 230 as, in the words of the Court of Appeal,
"afford[ing] interactive service providers broad immunity from tort liability for
third party speech" (*Hassell v. Bird*, at p. 1362).  The Court of Appeal further
acknowledged that "section 230 also 'precludes courts from entertaining claims
that would place a computer service provider in a publisher's role.  Thus, lawsuits
seeking to hold a service provider liable for its exercise of a publisher's traditional
editorial functions — such as deciding whether to publish, withdraw, postpone or
alter content — are barred.' "  (*Id.*, at pp. 1361-1362, quoting *Zeran v. America
Online, Inc.* (4th Cir. 1997) 129 F.3d 327, 330 (*Zeran*).)

The Court of Appeal nevertheless determined that section 230 does not
prohibit a directive that Yelp remove the challenged reviews.  The court reasoned
that "[t]he removal order does not violate . . . section 230 because it does not
impose any liability on Yelp.  In this defamation action, [plaintiffs] filed their
complaint against Bird, not Yelp; obtained a default judgment against Bird, not
Yelp; and [were] awarded damages and injunctive relief against Bird, not Yelp."
(*Hassell v. Bird*, *supra*, 247 Cal.App.4th at p. 1363.)

The Court of Appeal recognized that other courts (e.g., *Kathleen R. v. City
of Livermore* (2001) 87 Cal.App.4th 684 (*Kathleen R.*); *Noah v. AOL Time
Warner, Inc.* (E.D.Va. 2003) 261 F.Supp.2d 532; *Smith v. Intercosmos Media
Group* (E.D.La., Dec. 17, 2002, No. 02-1964) 2002 WL 31844907; *Medytox
Solutions, Inc. v. Investorshub.com, Inc.* (Fla.Dist.Ct.App. 2014) 152 So.3d 727)
had construed section 230 immunity as extending to claims for injunctive relief.
(*Hassell v. Bird*, *supra*, 247 Cal.App.4th at p. 1364.)  But the Court of Appeal

10

regarded those cases as inapposite because they involved situations in which section 230 immunity had been interposed by a named party at a stage of the proceedings when the cases merely involved allegations of improper conduct by a third party, "and not a judicial determination that defamatory statements had, in fact, been made by such third party on the Internet service provider's Web site" in a case filed against only the third party. (*Hassell v. Bird*, at pp. 1364-1365.) The court also rejected the argument that the prospect of contempt sanctions would amount to "liability" under the statute. (*Id*., at p. 1365.) According to the Court of Appeal, "sanctioning Yelp for violating a court order would not implicate section 230 at all; it would not impose liability on Yelp as a publisher or distributor of third party content." (*Ibid*.)

The Court of Appeal thus affirmed the superior court's order denying Yelp's motion to set aside and vacate the judgment, albeit with instructions to the superior court to modify the order on remand so that it compelled only the removal of the three challenged reviews. (*Hassell v. Bird*, *supra*, 247 Cal.App.4th at pp. 1365-1366.)[7] We granted review.

## II. DISCUSSION

Before this court, Yelp renews the constitutional and statutory arguments it raised before the Court of Appeal. Namely, Yelp maintains that the removal order does not comport with due process insofar as it directs Yelp to remove the three reviews at issue without affording prior notice and an opportunity to be heard. Yelp also claims that this aspect of the order violates section 230 by treating it as

---

[7] This modification owed to the Court of Appeal's conclusion that "to the extent the trial court additionally ordered Yelp to remove subsequent comments that Bird or anyone else might post, the removal order is an overbroad prior restraint on speech." (*Hassell v. Bird*, *supra*, 247 Cal.App.4th at p. 1360.) The Court of Appeal therefore remanded the case "to the trial court with directions that it modify the removal order consistent with this limitation." (*Ibid*.)

11

"the publisher or speaker of . . . information provided by another information content provider." (§ 230(c)(1); see also § 230(e)(3).) Because the statutory argument is dispositive, there is no need to address the due process question. (See *Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1102 ["[o]ur jurisprudence directs that we avoid resolving constitutional questions if the issue may be resolved on narrower grounds"]; *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230-231.)

## A. Section 230

Section 230 appears within the Communications Decency Act of 1996,[8] enacted as Title V of the Telecommunications Act of 1996 (Pub.L. No. 104-104, 110 Stat. 56). Congress enacted section 230 "for two basic policy reasons: to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material." (*Carafano v. Metrosplash.com, Inc.* (9th Cir. 2003) 339 F.3d 1119, 1122; see also *Barrett*, *supra*, 40 Cal.4th at pp. 50-54 [reviewing the legislative history of section 230].) One of the impetuses for section 230 was a judicial decision opining that because an operator of Internet bulletin boards had taken an active role in policing the content of these fora, for purposes of defamation law it could be regarded as the "publisher" of material posted on these boards by users. (*Stratton Oakmont, Inc. v. Prodigy Services Co.* (N.Y.Sup.Ct. 1995) 23 Media L.Rep. 1794 [1995 WL 323710]; see also *Barrett*, *supra*, 40 Cal.4th at pp. 50-53.)

Section 230 begins with a series of findings and policy declarations. The findings include, "The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary

---

[8]    Provisions of the Communications Decency Act of 1996 different from the ones presently before the court were struck down as unconstitutional in *Reno v. American Civil Liberties Union* (1997) 521 U.S. 844.

12

advance in the availability of educational and informational resources to our citizens" (§ 230(a)(1)), and "The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation" (§ 230(a)(4)). The policies include the goals "to promote the continued development of the Internet and other interactive computer services and other interactive media" (§ 230(b)(1)), and "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation" (§ 230(b)(2)).

Implementing these views, section 230(c)(1) provides, "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."[9] Section 230(e)(3), meanwhile, relates in relevant part, "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." Section 230 defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." (§ 230(f)(2).) The term "information content provider," meanwhile, "means any person or entity that is responsible, in whole or in part, for the creation or

---

[9] Section 230(c)(2), another immunity provision within the statute, provides, "No provider or user of an interactive computer service shall be held liable on account of — [¶] (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or [¶] (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1)." Yelp's claim of immunity invokes section 230(c)(1), not section 230(c)(2).

development of information provided through the Internet or any other interactive computer service." (§ 230(f)(3).)

## B. Judicial Construction of Section 230

The immunity provisions within section 230 "have been widely and consistently interpreted to confer broad immunity against defamation liability for those who use the Internet to publish information that originated from another source." (*Barrett*, *supra*, 40 Cal.4th at p. 39; accord, *Doe v. MySpace, Inc.* (5th Cir. 2008) 528 F.3d 413, 418 ["[c]ourts have construed the immunity provisions in § 230 broadly in all cases arising from the publication of user-generated content"]; *Carafano v. Metrosplash.com, Inc.*, *supra*, 339 F.3d at p. 1123 ["reviewing courts have treated § 230(c) immunity as quite robust"].) Although a full review of the substantial body of case law interpreting section 230 is unnecessary to resolve this case, an overview of certain leading decisions follows.

### 1. Zeran

Section 230 was the subject of an early and influential construction in *Zeran*, *supra*, 129 F.3d 327. (See *Barrett*, *supra*, 40 Cal.4th at p. 41 [describing *Zeran* as "[t]he leading case on section 230 immunity"].) The lawsuit in *Zeran* involved messages posted on an America Online, Inc. (AOL) online bulletin board. (*Zeran*, at p. 329.) These messages promoted t-shirts, bumper stickers, and key chains bearing offensive content, and added that anyone interested in purchasing one of these items should contact the plaintiff at his home phone number. (*Ibid.*) As a result of these posts, the plaintiff — who in fact had no connection to the wares — was inundated by angry phone calls, including death threats. (*Ibid.*) The plaintiff subsequently brought a negligence claim against AOL, alleging that AOL took an unreasonably long time to remove the messages, "refused to post retractions of those messages, and failed to screen for similar postings thereafter." (*Id.*, at p. 328.)

14

AOL claimed immunity under section 230. (*Zeran*, *supra*, 129 F.3d at p. 328.) In affirming a grant of judgment on the pleadings entered in favor of AOL on this ground (*id*., at p. 330), the federal court of appeals in *Zeran* emphasized the broad parameters of the statutory grant of immunity. The court observed, "By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service. Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions — such as deciding whether to publish, withdraw, postpone or alter content — are barred." (*Ibid*.) The *Zeran* court continued, "The purpose of this statutory immunity is not difficult to discern. Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium. The imposition of tort liability on service providers for the communications of others represented, for Congress, simply another form of intrusive government regulation of speech. Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum." (*Ibid*.)

The plaintiff in *Zeran*, *supra*, 129 F.3d 327, argued that section 230 should be read narrowly, so that AOL could be held liable as a "distributor" of the online posts. (*Zeran*, at pp. 331-332.) In rejecting this limited view of section 230 immunity, the *Zeran* court stressed that if the notice-based legal standard for defamation liability that applies to distributors of printed information was transplanted to the Internet, it would place online intermediaries in an untenable position. "If computer service providers were subject to distributor liability," the court observed, "they would face potential liability each time they receive notice

of a potentially defamatory statement — from any party, concerning any message. Each notification would require a careful yet rapid investigation of the circumstances surrounding the posted information, a legal judgment concerning the information's defamatory character, and an on-the-spot editorial decision whether to risk liability by allowing the continued publication of that information. Although this might be feasible for the traditional print publisher, the sheer number of postings on interactive computer services would create an impossible burden in the Internet context." (*Zeran*, at p. 333.)  In the same vein, the court also stressed that "notice-based liability for interactive computer service providers would provide third parties with a no-cost means to create the basis for future lawsuits.  Whenever one was displeased with the speech of another party conducted over an interactive computer service, the offended party could simply 'notify' the relevant service provider, claiming the information to be legally defamatory." (*Ibid*.)

       2.  Kathleen R.

Other courts have followed *Zeran* in adopting a broad view of section 230's immunity provisions.  (See *Barrett*, *supra*, 40 Cal.4th at p. 39.)  Several decisions by the Courts of Appeal of this state, for example, have advanced a similar understanding of section 230.  (See, e.g., *Doe II v. MySpace Inc.* (2009) 175 Cal.App.4th 561, 567-575 [section 230 immunity applies to tort claims against a social networking website, brought by minors who claimed that they had been assaulted by adults they met on that website]; *Delfino v. Agilent Technologies, Inc.* (2007) 145 Cal.App.4th 790, 804-808 [section 230 immunity applies to tort claims against an employer that operated an internal computer network used by an employee to allegedly communicate threats against the plaintiff]; *Gentry v. eBay, Inc.* (2002) 99 Cal.App.4th 816, 828-836 [section 230 immunity applies to tort and

16

statutory claims against an auction website, brought by plaintiffs who allegedly purchased forgeries from third party sellers on the website].)

Among the decisions of the Courts of Appeal construing section 230, the ruling in *Kathleen R.*, *supra*, 87 Cal.App.4th 684, is particularly relevant here, for as recognized by the Court of Appeal below, the court in *Kathleen R.* held that section 230 immunity extends to claims for injunctive relief.

The plaintiff in *Kathleen R.*, *supra*, 87 Cal.App.4th 684, filed suit against a city after her son, a minor, used computers at the city library to download sexually explicit photos from the Internet. (*Id.*, at p. 690.) She brought claims under state and federal law. (*Id.*, at p. 691.) The plaintiff sought injunctive relief in connection with all of her causes of action, with her state-law claims seeking to prevent the city "from acquiring or maintaining computers which allow people to access obscenity or minors to access harmful sexual matter; from maintaining any premises where minors have that ability; and from expending public funds on such computers." (*Ibid.*)

The court in *Kathleen R.*, *supra*, 87 Cal.App.4th 684, held that section 230 barred all of the plaintiff's state-law claims, even insofar as they sought injunctive relief.[10] (*Kathleen R.*, at p. 698.) In reaching this result, the court expressly rejected the plaintiff's position that section 230 immunity does not adhere to the extent that a plaintiff pursues declaratory or injunctive relief, as opposed to damages. (*Kathleen R.*, at p. 698.) The court reasoned, "Section 230 provides broadly that '[n]o cause of action may be brought *and* no liability may be imposed under any State or local law that is inconsistent with this section.' (§ 230(e)(3), italics added.) Thus, even if for purposes of section 230 'liability' means only an award of damages [citation], the statute by its terms also precludes other causes of

---

[10]    The court in *Kathleen R.*, *supra*, 87 Cal.App.4th 684, rejected the plaintiff's federal claim on a different ground. (*Id.*, at pp. 698-702.)

17

action for other forms of relief." (*Kathleen R.*, at p. 698.) The court also observed that the plaintiff's pursuit of injunctive relief, if it came to fruition, could "prevent [the city] from providing open access to the Internet on its library computers," which would "contravene section 230's stated purpose of promoting unfettered development of the Internet no less than her damage claims." (*Ibid.*)

3. Barrett

In the one prior occasion we have had to construe section 230, we, too, have read its provisions as conferring broad immunity.

In *Barrett*, *supra*, 40 Cal.4th 33, the plaintiffs sued for defamation after the defendant posted copies of an assertedly libelous article on two websites. (*Id.*, at pp. 40-41.) The defendant had received the article from another individual via an e-mail. (*Id.*, at p. 41.)

In vacating an order entered by the superior court, which had granted the defendant's motion to strike under the anti-SLAPP statute, the Court of Appeal in *Barrett* adopted the same narrow reading of the word "publisher" within section 230(c)(1) that had been rejected by the court in *Zeran* — i.e., it construed section 230 as being concerned only with preventing online intermediaries from being held liable under standards applicable to publishers, while leaving distributor liability, where appropriate, intact. In the view of the Court of Appeal in *Barrett*, when the defendant in that case reposted the article she had received from another online source, she acted as a distributor of this information. (*Barrett*, *supra*, 40 Cal.4th at p. 39.) This designation meant that the defendant could be held liable if she distributed a defamatory statement with notice of its libelous character. (*Id.*, at pp. 39, 41, 44-45.)

We reversed. Our unanimous majority opinion in *Barrett*, *supra*, 40 Cal.4th 33, rejected both the Court of Appeal's interpretation of the term "publisher" within section 230(c)(1), and a comparably constrained construction

18

of the term "user" within that same subsection that would distinguish between "passive" users who could claim section 230 immunity and "active" users who could not. (*Barrett*, at p. 63.) As had the *Zeran* court, we declined to read section 230(c)(1) as leaving Internet intermediaries subject to liability on the same terms applicable to distributors of printed material. Instead, we endorsed as "sound" *Zeran*'s construction of "publisher" (*Barrett*, at p. 48), and adopted a similarly "inclusive" interpretation of that word (*id*., at p. 49). We observed, "the terms of section 230(c)(1) . . . reflect the intent to promote active screening by service providers of online content provided by others. Congress implemented its intent . . . by broadly shielding *all* providers from liability for 'publishing' information received from third parties. Congress contemplated self-regulation, rather than regulation compelled at the sword point of tort liability." (*Id*., at p. 53, fn. omitted.) Later, we reiterated that section 230 confers "blanket immunity from tort liability for online republication of third party content." (*Barrett*, at p. 57.)[11]

Our analysis in *Barrett*, *supra*, 40 Cal.4th 33, also elaborated upon Congress's intent in enacting section 230, and the practical consequences associated with a cramped construction of the statute. We explained, "It is inaccurate to suggest that Congress was indifferent to free speech protection when it enacted section 230," given the statute's many findings extolling the value of Internet speech and evincing legislators' interest in further development of this forum. (*Barrett*, at p. 56.) We also noted that "[t]he provisions of section 230(c)(1), conferring broad immunity on Internet intermediaries, are themselves a

---

[11]     *Barrett*, *supra*, 40 Cal.4th 33, was clear that section 230 immunity is broad — not all-encompassing. We recognized, for example, that "[a]t some point, active involvement in the creation of a defamatory Internet posting would expose [an otherwise immunized] defendant to liability as an original source." (*Barrett*, at p. 60, fn. 19; see also § 230(e)(1), (2), (4), (5) [describing areas of the law as to which section 230 immunity has no effect].)

19

strong demonstration of legislative commitment to the value of maintaining a free market for online expression." (*Ibid*.) A limited construction of section 230 would conflict with Congress's goal of facilitating online discourse, we observed, because "subjecting Internet service providers and users to defamation liability" for the republication of online content — even under the standards applicable to distributors — "would tend to chill online speech." (*Barrett*, at p. 56, citing *Carafano v. Metrosplash.com, Inc.*, *supra*, 339 F.3d at pp. 1123-1124, *Batzel v. Smith* (9th Cir. 2003) 333 F.3d 1018, 1027-1028, *Noah v. AOL Time Warner, Inc.*, *supra*, 261 F.Supp.2d at p. 538, *Blumenthal v. Drudge* (D.D.C. 1998) 992 F.Supp. 44, 52, *Donato v. Moldow* (N.J.Super.Ct.App.Div. 2005) 865 A.2d 711, 726.) This chilling effect could materialize for reasons including the fact that "[a]ny investigation of a potentially defamatory Internet posting is . . . a daunting and expensive challenge." (*Id*., at p. 57.)

In closing, our opinion in *Barrett*, *supra*, 40 Cal.4th 33, voiced some qualms about the result it reached. It explained that "[w]e share the concerns of those who have expressed reservations about the *Zeran* court's broad interpretation of section 230 immunity. The prospect of blanket immunity for those who intentionally redistribute defamatory statements on the Internet has disturbing implications." (*Id*., at pp. 62-63.) But, we added, these concerns were of no legal consequence, because the tools of statutory interpretation compelled a broad construction of section 230. (*Barrett*, at p. 63.)

### C. Analysis

In construing section 230, we apply our standard approach to statutory interpretation. " 'When we interpret a statute, "[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory

framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." [Citation.] "Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' [Citation.]" (*City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 616-617.)

Our analysis of the statute begins with an uncontroversial observation: Yelp could have promptly sought and received section 230 immunity had plaintiffs originally named it as a defendant in this case. There is no doubt that Yelp is a "provider or user of an interactive computer service" within the meaning of section 230(c)(1) (see *Barnes v. Yahoo!, Inc.* (9th Cir. 2009) 570 F.3d 1096, 1101 [concluding that as an operator of a website, Yahoo acts as a provider of an interactive computer service]), or that the substance of the reviews was provided to Yelp by "another information content provider" (§ 230(c)(1); see *Shiamili v. Real Estate Group of New York, Inc.* (N.Y. 2011) 952 N.E.2d 1011, 1019-1020). Had plaintiffs' claims for defamation, intentional infliction of emotional distress, and false light been alleged directly against Yelp, these theories would be readily understood as treating Yelp as the "publisher or speaker" of the challenged reviews. (See, e.g., *Barrett*, *supra*, 40 Cal.4th at p. 63 [section 230 applies to claims for defamation]; *Bennett v. Google, LLC* (D.C. Cir. 2018) 882 F.3d 1163, 1164, 1169 [section 230 applies to claims for intentional infliction of emotional distress]; *Jones v. Dirty World Entertainment Recordings LLC* (6th Cir. 2014) 755

21

F.3d 398, 402, 417 [section 230 applies to claims for defamation, intentional infliction of emotional distress, and false light].)  This immunity, moreover, would have shielded Yelp from the injunctive relief that plaintiffs seek.  (See *Kathleen R.*, *supra*, 87 Cal.App.4th at p. 687; *Noah v. AOL Time Warner, Inc.*, *supra*, 261 F.Supp.2d at pp. 539-540; *Smith v. Intercosmos Media Group, Inc.*, *supra*, 2002 WL 31844907 at pp. *4-*5; *Medytox Solutions, Inc. v. Investorshub.com, Inc.*, *supra*, 152 So.3d at p. 731.)

The question here is whether a different result should obtain because plaintiffs made the tactical decision not to name Yelp as a defendant.  Put another way, we must decide whether plaintiffs' litigation strategy allows them to accomplish indirectly what Congress has clearly forbidden them to achieve directly.  We believe the answer is no.

Even though plaintiffs did not name Yelp as a defendant, their action ultimately treats it as "the publisher or speaker of . . . information provided by another information content provider."  (§ 230(c)(1).)  With the removal order, plaintiffs seek to overrule Yelp's decision to publish the three challenged reviews. Where, as here, an Internet intermediary's relevant conduct in a defamation case goes no further than the mere act of publication — including a refusal to depublish upon demand, after a subsequent finding that the published content is libelous — section 230 prohibits this kind of directive.  (See *Barrett*, *supra*, 40 Cal.4th at pp. 48, 53; *Zeran*, *supra*, 129 F.3d at p. 330 [under section 230, "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions — such as deciding whether to publish, withdraw, postpone or alter content — are barred"]; *Medytox Solutions, Inc. v. Investorshub.com, Inc.*, *supra*, 152 So.3d at p. 731 ["[a]n action to force a website to remove content on the sole

22

basis that the content is defamatory is necessarily treating the website as a publisher, and is therefore inconsistent with section 230"].)[12]

Plaintiffs assert in their briefing that "Yelp's duty to comply [with the removal order] does not arise from its status as a publisher or speaker, but as a party through whom the court must enforce its order." To plaintiffs, "the removal order simply prohibits Yelp from continuing to be the conduit through which Bird violates her injunction." Just as other courts have rebuffed attempts to avoid section 230 through the "creative pleading" of barred claims (*Kimzey v. Yelp! Inc.* (9th Cir. 2016) 836 F.3d 1263, 1266), we are not persuaded by plaintiffs' description of the situation before the court. It is true that plaintiffs obtained a default judgment and injunction in a lawsuit that named only Bird as a defendant.

---

[12] Although not directly pertinent to this case, we observe that in another instance where Congress became aware of procedural end-runs around section 230, it took steps to rein in these practices — instead of regarding a judgment so obtained as a fait accompli that must be enforced, without further consideration of the circumstances surrounding it.

Specifically, in 2010 Congress enacted the Securing the Protection of Our Enduring and Established Constitutional Heritage Act (SPEECH Act), 28 U.S.C. § 4101 et seq. This measure responded to concerns that defamation judgments were being obtained in countries that did not recognize the same free-speech protections as those provided in the United States, "significantly chilling American free speech and restricting both domestic and worldwide access to important information" in the United States. (Sen.Rep. No. 111-224, 2d Sess., p. 2 (2010).)

To combat forum shopping and "ensure that American authors, reporters, and publishers have nationwide protection from foreign libel judgments" (Sen.Rep. No. 111-224, *supra*, at p. 2), the SPEECH Act includes provisions such as one providing that "[n]otwithstanding any other provision of Federal or State law, a domestic court shall not recognize or enforce a foreign judgment for defamation against the provider of an interactive computer service, as defined in section 230 of the Communications Act of 1934 (47 U.S.C. [§] 230) unless the domestic court determines that the judgment would be consistent with section 230 if the information that is the subject of such judgment had been provided in the United States." (28 U.S.C. § 4102(c)(1).)

And it is also true that as a general rule, when an injunction has been obtained, certain nonparties may be required to comply with its terms. (See, e.g., *Ross v. Superior Court*, *supra*, 19 Cal.3d at p. 906.) But this principle does not supplant the inquiry that section 230(c)(1) requires. Parties and nonparties alike may have the responsibility to comply with court orders, including injunctions. But an order that treats an Internet intermediary "as the publisher or speaker of any information provided by another information content provider" nevertheless falls within the parameters of section 230(c)(1). (Cf. *Giordano v. Romeo* (Fla.Dist.Ct.App. 2011) 76 So.3d 1100, 1102 [recognizing that an online intermediary may claim section 230 immunity from injunctive relief associated with a defamation claim, notwithstanding a lower-court determination that at least part of the challenged online post was defamatory].) In substance, Yelp is being held to account for nothing more than its ongoing decision to publish the challenged reviews. Despite plaintiffs' generic description of the obligation they would impose on Yelp, in this case this duty is squarely derived from "the mere existence of the very relationship that Congress immunized from suit." (*Klayman v. Zuckerberg* (D.C. Cir. 2014) 753 F.3d 1354, 1360.)[13]

At the same time, we recognize that not all legal duties owed by Internet intermediaries necessarily treat them as the publishers of third party content, even when these obligations are in some way associated with their publication of this

---

[13]  In arguing that section 230 immunity should not apply, Justice Liu emphasizes that here there was a judicial determination — albeit through an uncontested proceeding — that the challenged reviews are defamatory. (Dis. opn. of Liu, J., *post*, at pp. 2-3.) We recognize that in applying section 230 a distinction *could*, in theory, be drawn between situations in which an injunction (or its extension to a nonparty) follows from a judicial finding of some kind, and scenarios where there has been no such determination. But we see no persuasive indication that this is a distinction Congress *wanted* courts to regard as decisive in circumstances such as these. (Accord, *Giordano v. Romeo*, *supra*, 76 So.3d at p. 1102.)

material.  (See, e.g., *Barnes v. Yahoo!, Inc.*, *supra*, 570 F.3d at p. 1107 [regarding section 230 immunity as inapplicable to a claim of promissory estoppel alleging that an Internet intermediary promised to remove offensive content].)  In this case, however, Yelp is inherently being treated as the publisher of the challenged reviews, and it has not engaged in conduct that would take it outside section 230's purview in connection with the removal order.  The duty that plaintiffs would impose on Yelp, in all material respects, wholly owes to and coincides with the company's continuing role as a publisher of third party online content.

In his dissent, Justice Cuéllar argues that even if the injunction cannot on its face command Yelp to remove the reviews, the removal order nevertheless could run to Yelp *through Bird* under an aiding and abetting theory premised on conduct that remains inherently that of a publisher.  (See dis. opn. of Cuéllar, J., *post*, at pp. 3, 20-22, 34-37.)  We disagree.  As applied to such behavior, Justice Cuéllar's approach would simply substitute one end-run around section 230 immunity for another.  (Accord, *Blockowicz v. Williams* (7th Cir. 2010) 630 F.3d 563, 568.)  As for the other scenarios involving materially different types of conduct that Justice Cuéllar might hypothesize, such as conspiracies between a named party and an Internet republisher who has not been named as a party, it suffices for now to say that they are not before this court, and we have no occasion to consider whether they could lead to some remedy vis-à-vis the republisher.[14]

---

**14**     As previously noted, when the trial court denied Yelp's motion to set aside and vacate the judgment, it emphasized several facts that, in the court's opinion, indicated Yelp was aiding and abetting Bird's violation of the injunction.  The court observed that Yelp had featured at least one of Bird's defamatory reviews as a "Recommended Review"; that Yelp had not factored some positive reviews into the Hassell Law Group's overall rating; that Yelp had raised arguments in connection with its motion that would invalidate the judgment entirely, as opposed to merely the portion of the removal order specifically directed at it; and that Yelp

Plaintiffs also assert that Yelp cannot claim section 230 immunity because, under section 230(e)(3), no "cause of action" has been alleged directly against it as a defendant, and in their view making Yelp subject to an injunction does not amount to the imposition of "liability." This argument reads constraining force into the language within section 230(e)(3) that provides, "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." This phrasing does not provide strong support for, much less compel, plaintiffs' construction. Section 230(e)(3) does not expressly demand that a cause of action always must be alleged directly against an Internet intermediary as a named defendant for the republisher to claim immunity under the statute. And in common legal parlance at the time of section 230's enactment, "liability" could encompass more than merely the imposition of damages. (See Black's Law Dict. (6th ed. 1990) p. 914 [defining "liability" as "a broad legal term" that "has been referred to as of the most comprehensive significance,

refused to remove the reviews at issue, "notwithstanding a judicial finding that Bird's reviews are defamatory."

Even though it upheld the removal order in most respects, the Court of Appeal did not rely on an aiding and abetting theory to justify the extension of the injunction to Yelp. (See *Hassell v. Bird*, *supra*, 247 Cal.App.4th at p. 1364.) We expressly reject the argument, offered by Justice Cuéllar in his dissent (dis. opn. of Cuéllar, J., *post*, at p. 35), that the circumstances stressed by the trial court (plus, perhaps, Yelp's letter to Hassell, in which it explained its decision not to remove the reviews) might somehow serve to deprive Yelp of immunity. Most of these facts involve what are clearly publication decisions by Yelp. (See, e.g., *Jones v. Dirty World Entertainment Recordings LLC*, *supra*, 755 F.3d at pp. 414-415.) Meanwhile, we do not regard the letter relating the basis for Yelp's decision, or Yelp's failure to make only pinpoint challenges to the injunction in court, as somehow transforming the company into something other than a publisher of third party content for purposes of the removal order. Section 230 immunity is not that fragile.

26

including almost every character of hazard or responsibility, absolute, contingent, or likely"].)**15**

Even more fundamentally, plaintiffs' interpretation misses the forest for the trees. Section 230(e)(3) underscores, rather than undermines, the broad scope of section 230 immunity by prohibiting not only the imposition of "liability" under certain state-law theories, but also the pursuit of a proscribed "cause of action." (See *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.* (4th Cir. 2009) 591 F.3d 250, 254 [section 230 is not just a " 'defense to liability' "; it instead confers " 'immunity from suit' " (italics omitted)]; *Medytox Solutions, Inc. v. Investorshub.com, Inc.*, *supra*, 152 So.3d at p. 731.) This inclusive language, read in connection with section 230(c)(1) and the rest of section 230, conveys an intent to shield Internet intermediaries from the burdens associated with defending against state-law claims that treat them as the publisher or speaker of third party content, and from compelled compliance with demands for relief that, when viewed in the context of a plaintiff's allegations, similarly assign them the legal role and responsibilities of a publisher qua publisher. (See *Barrett*, *supra*, 40 Cal.4th at pp. 53, 56, 57; *Barnes v. Yahoo!, Inc.*, *supra*, 570 F.3d at pp. 1101-1102; *Zeran*, *supra*, 129 F.3d at p. 330.) As evidenced by section 230's findings, Congress believed that this targeted protection for republishers of online content

---

**15** Justice Cuéllar would define "liability" within section 230(e)(3) as "a financial or legal obligation." (Dis. opn. of Cuéllar, J., *post*, at p. 11.) His dissenting opinion then proceeds as if the broad word "legal" within this very definition is irrelevant. This oversight is in a sense understandable, because, inconveniently, plaintiffs absolutely regard Yelp as having a "legal obligation" to comply with the removal order.

Yet Justice Cuéllar's equation of "liability" under section 230(e)(3) with only financial obligations raises other questions that cannot be satisfactorily answered. Among them, if "liability" involves only financial debts, it is unclear why Congress recently felt the need to exclude from section 230 immunity certain state-law criminal actions associated with sex trafficking. (§ 230(e)(5)(B), (C).)

would facilitate the ongoing development of the Internet.  (See § 230(a)(1), (a)(4), (b)(1), (b)(2).)

These interests are squarely implicated in this case.  An injunction like the removal order plaintiffs obtained can impose substantial burdens on an Internet intermediary.  Even if it would be mechanically simple to implement such an order, compliance still could interfere with and undermine the viability of an online platform.  (See *Noah v. AOL Time Warner, Inc.*, *supra*, 261 F.Supp.2d at p. 540 ["in some circumstances injunctive relief will be at least as burdensome to the service provider as damages, and is typically more intrusive"].)  Furthermore, as this case illustrates, a seemingly straightforward removal order can generate substantial litigation over matters such as its validity or scope, or the manner in which it is implemented.  (See *Barrett*, *supra*, 40 Cal.4th at p. 57.)  Section 230 allows these litigation burdens to be imposed upon the *originators* of online speech.  But the unique position of Internet intermediaries convinced Congress to spare republishers of online content, in a situation such as the one here, from this sort of ongoing entanglement with the courts.[16]

---

[16]    There are numerous reasons why a removal order that appears facially valid may nevertheless be challenged by an Internet intermediary as illegitimate.  As detailed in the amicus curiae brief submitted by Professor Eugene Volokh, a document that purports to represent a proper removal order might have been fraudulently obtained, secured after only meager attempts at service, or represent a forgery.  A removal order also may be overbroad (as Bird claims to be the case here), or otherwise inaccurate or misleading.

Professor Volokh's brief incorporates a request for judicial notice of court filings that assertedly illustrate these concerns.  We denied this request for judicial notice by a separate order.  Formal notice is unnecessary to recognize the basic point being made — to wit, that plaintiffs' position, if accepted, would open the door to fraud and to sharp litigating tactics.  (See *People v. Acosta* (2002) 29 Cal.4th 105, 119, fn. 5 [denying a request for judicial notice of case files because such notice "is not necessary . . . to envision" the general circumstances evinced in the cases].)

28

To summarize, we conclude that in light of Congress's designs with respect to section 230, the capacious language Congress adopted to effectuate its intent, and the consequences that could result if immunity were denied here, Yelp is entitled to immunity under the statute. Plaintiffs' attempted end-run around section 230 fails.[17]

The dissents see this case quite differently. The dissenting justices would endorse plaintiffs' gambit as consistent with Congress's intent in enacting section 230. We disagree on several levels with the dissents' construction of section 230.[18] The narrow, grudging view of section 230's immunity provisions advanced in both dissents is at odds with this court's analysis in *Barrett*, and for that matter with the views of virtually all courts that have construed section 230. Although Justice Cuéllar, in his dissent, repeatedly suggests that Yelp somehow improperly or prematurely injected itself into this action in a manner material to the necessary analysis (e.g., dis. opn. of Cuéllar, J., *post*, at pp. 6, 25, 26), with this case's

---

**17**  Other shortcomings of plaintiffs' approach further expose it as something quite different from what Congress intended. These include the fact that even if it were accepted, plaintiffs' vehicle for avoiding section 230 immunity would offer no remedy for those wronged by authors who write anonymously or using a pseudonym, and whose identities cannot be ascertained through third party discovery in cases filed against Doe defendants. For in those instances, no judgments, default or otherwise, could be obtained against the authors. (See Code Civ. Proc., § 474; *Flythe v. Solomon and Straus, LLC* (E.D.Pa., June 8, 2011, No. 09-6120) 2011 WL 2314391 at *1 ["default judgments cannot be entered against unnamed or fictitious parties because they have not been properly served"].)

**18**  We also dispute Justice Cuéllar's characterizations of various aspects of this opinion. Yet we see no need to address each of the numerous instances where his dissent misstates our views. It is enough to recall former Justice Werdegar's observation that "[c]haracterization by the . . . dissenters of the scope of the majority opinion is, of course, dubious authority." (*People v. Caballero* (2012) 55 Cal.4th 262, 271 (conc. opn. of Werdegar, J.).)

unusual litigation posture — which was engineered by plaintiffs, not Yelp — it was perfectly appropriate for Yelp to seek clarification of its legal obligations before plaintiffs chose to initiate contempt proceedings against it. Additionally, although the dispositive nature of Yelp's section 230 argument makes it unnecessary to dwell on the due process concerns addressed by Justice Kruger in her concurring opinion (see generally conc. opn. of Kruger, J., *post*), at a bare minimum we find it troubling that the dissents' approach, if it were the law, could create unfortunate incentives for plaintiffs to provide little or no prejudgment notice to persons or entities that could assert immunity as defendants. A plaintiff might reason that if even informal notice were provided, a nonparty republisher might seek to intervene as a defendant and claim immunity prior to the entry of judgment.[19]

Perhaps the dissenters' greatest error is that they fail to fully grasp how plaintiffs' maneuver, if accepted, could subvert a statutory scheme intended to promote online discourse and industry self-regulation. What plaintiffs did in attempting to deprive Yelp of immunity was creative, but it was not difficult. If plaintiffs' approach were recognized as legitimate, in the future other plaintiffs could be expected to file lawsuits pressing a broad array of demands for injunctive relief against compliant or default-prone original sources of allegedly tortious online content. Injunctions entered incident to the entry of judgments in these

---

[19]    Justice Cuéllar's dissenting opinion could be construed as allowing an injunction that on its face runs only against a party to be enforced, via a feeble aiding and abetting theory, against a different person or entity that *also* had been named as a party, but had successfully invoked section 230 immunity prior to the entry of judgment. (See, e.g., dis. opn. of Cuéllar, J., *post*, at pp. 34-37.) If that were the law, Justice Cuéllar would be correct that the incentive to intervene might be dampened because the invocation of section 230 immunity might have little practical effect in the long run. But it is not the law.

cases then would be interposed against providers or users of interactive computer services who could not be sued directly, due to section 230 immunity. As evinced by the injunction sought in *Kathleen R.*, *supra*, 87 Cal.App.4th 684, which demanded nothing less than control over what local library patrons could view on the Internet (*id.*, at p. 691), the extension of injunctions to these otherwise immunized nonparties would be particularly conducive to stifling, skewing, or otherwise manipulating online discourse — and in ways that go far beyond the deletion of libelous material from the Internet. Congress did not intend this result, any more than it intended that Internet intermediaries be bankrupted by damages imposed through lawsuits attacking what are, at their core, only decisions regarding the publication of third party content.

For almost two decades, courts have been relying on section 230 to deny plaintiffs injunctive relief when their claims inherently treat an Internet intermediary as a publisher or speaker of third party conduct. Certainly in some instances where immunity has been recognized prior to judgment, the plaintiff was in fact defamed or otherwise suffered tortious harm susceptible to being remedied through an injunction. Yet Congress has declined to amend section 230 to authorize injunctive relief against mere republishers, even as it has limited immunity in other ways. (See Pub.L.No. 115-164, §4 (April 11, 2018) 132 Stat. 1253 [amending section 230 to add section 230(e)(5), clarifying that immunity does not apply to certain civil claims and criminal actions associated with sex trafficking].) Although this acquiescence is not itself determinative, it provides a final indication that the dissenting justices are simply substituting their judgment for that of Congress regarding what amounts to good policy with regard to online speech. But that is not our role.

Even as we conclude that Yelp is entitled to immunity, we echo *Barrett*, *supra*, 40 Cal.4th 33, in emphasizing that our reasoning and result do not connote

a lack of sympathy for those who may have been defamed on the Internet. (*Barrett*, at p. 63.)  Nevertheless, on this record it is clear that plaintiffs' legal remedies lie solely against Bird, and cannot extend — even through an injunction — to Yelp.

On this last point, we observe that plaintiffs still have powerful, if uninvoked, remedies available to them.  Our decision today leaves plaintiffs' judgment intact insofar as it imposes obligations on *Bird*.  Even though neither plaintiffs nor Bird can force Yelp to remove the challenged reviews, the judgment requires Bird to undertake, at a minimum, reasonable efforts to secure the removal of her posts.  A failure to comply with a lawful court order is a form of civil contempt (Code Civ. Proc., §1209, subd. (a)(5)), the consequences of which can include imprisonment (see *In re Young* (1995) 9 Cal.4th 1052, 1054).  Much of the dissents' rhetoric regarding the perceived injustice of today's decision assumes that plaintiffs' remaining remedies will be ineffective.  One might more readily conclude that the prospect of contempt sanctions would resonate with a party who, although not appearing below, has now taken the step of filing an amicus curiae brief with this court.

### III.    DISPOSITION

For the foregoing reasons, section 230 immunity applies here.  We therefore reverse the judgment of the Court of Appeal insofar as it affirmed the trial court's denial of Yelp's motion to set aside and vacate the judgment.  That motion should have been granted to the extent that it sought to delete from the order issued upon entry of the default judgment any requirement that Yelp remove the challenged reviews or subsequent comments of the reviewers.  The cause is remanded for further proceedings as appropriate in light of this court's disposition.

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

**CHIN, J.**
**CORRIGAN, J.**

33

**CONCURRING OPINION BY KRUGER, J.**

I concur in the judgment. I agree with the plurality opinion that the injunction against Yelp Inc. (Yelp) is invalid, but I begin with a more basic reason. Yelp is not a party to this litigation, and the courts' power to order people to do (or to refrain from doing) things is generally limited to the parties in the case. Although there are qualifications to the rule, there is no exception that permits the sort of order we confront here: an order directing a nonparty website operator to remove third party user content just in case the user defaults on her own legal obligation to remove it. Before Yelp can be compelled to remove content from its website, the company is entitled to its own day in court.

The plurality opinion instead concludes the injunction is invalid because it violates section 230 of title 47 of the United States Code, part of the federal Communications Decency Act of 1996 (Pub.L. No. 104-104 (Feb. 8, 1996) 110 Stat. 56; hereafter section 230), a statute that bars civil suit against website operators like Yelp for permitting third parties to post content on their sites. Although I believe it is unnecessary to reach the issue, I agree with the plurality opinion that even if it were permissible to enter an injunction against a nonparty website operator based solely on its past decision to permit the defendant to post content on its website, the operator would be entitled to section 230 immunity in that proceeding. I express no view on how section 230 might apply to a different request for injunctive relief based on different justifications.

1

# I.

## A.

Although the plurality opinion begins its analysis with the special immunity conferred on interactive computer service providers in section 230, I would begin with legal principles of considerably older vintage.  It is an "elementary common law principle of jurisprudence"—followed in California, as elsewhere—that "a judgment may not be entered either for or against one not a party to an action or proceeding." (*Fazzi v. Peters* (1968) 68 Cal.2d 590, 594.)  A court's power is limited to adjudicating disputes between persons who have been designated as parties or made parties by service of process; it has "no power to adjudicate a personal claim or obligation unless it has jurisdiction over the person of the defendant." (*Zenith Corp. v. Hazeltine* (1969) 395 U.S. 100, 110 (*Zenith*).)  This common law principle is backed by the Constitution's guarantee of procedural fairness—a guarantee that, at its core, entitles persons to meaningful notice and opportunity to be heard before a court fixes their legal rights and responsibilities. (*Hansberry v. Lee* (1940) 311 U.S. 32, 40.)

Consistent with this principle, courts have long observed a general rule against entering injunctions against nonparties.  An injunction is a " 'personal decree' " that " 'operates on the person of the defendant by commanding him to do or desist from certain action' " as a remedy for violations or threatened violations of the law.  (*Comfort v. Comfort* (1941) 17 Cal.2d 736, 741.)  More than a century ago, the United States Supreme Court invalidated an injunction enjoining nonparties, explaining:  "[W]e do not think it comports with well-settled principles of equity procedure to include [nonparties] in an injunction in a suit in which they were not heard or represented, or to subject them to penalties for contempt in disregarding such an injunction." (*Scott v. Donald* (1897) 165 U.S. 107, 117.)  Some decades later, the high court again invalidated an injunction as "clearly erroneous" insofar as it "assumed to make punishable as a contempt the conduct of persons who act independently and whose rights have not been adjudged

2

according to law." (*Chase National Bank v. Norwalk* (1934) 291 U.S. 431, 436–437, fn. omitted.) And again, in *Zenith*, *supra*, 395 U.S. at page 110, the high court ruled that the district court had erred in entering an injunction against an entity (there, the parent company of the named defendant) that "was not named as a party, was never served and did not formally appear at the trial."

Judge Learned Hand, in an oft-cited statement of the rule, explained its logic in this way: "[N]o court can make a decree which will bind any one but a party; a court of equity is as much so limited as a court of law; it cannot lawfully enjoin the world at large, no matter how broadly it words its decree. If it assumes to do so, the decree is pro tanto brutum fulmen, and the persons enjoined are free to ignore it. It is not vested with sovereign powers to declare conduct unlawful; its jurisdiction is limited to those over whom it gets personal service, and who therefore can have their day in court." (*Alemite Mfg. Corp. v. Staff* (2d Cir. 1930) 42 F.2d 832, 832–833 (*Alemite*).) The court in *Alemite* held that the district court had no power to issue an injunction against a former employee of the defendant because the former employee was not a party to the underlying action. (*Ibid.*) California courts, employing the same general principle, have reached similar conclusions in a variety of other scenarios. (*People ex rel. Gwinn v. Kothari* (2000) 83 Cal.App.4th 759, 769 [" 'The courts . . . may not grant an . . . injunction so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law.' "]; *People v. Conrad* (1997) 55 Cal.App.4th 896, 902 (*Conrad*) ["Injunctions are not effective against the world at large."].)

As all these authorities have recognized, while the law generally forbids courts from naming nonparties, the law does in certain circumstances permit a court to *enforce* an injunction against a nonparty. Without such a rule, enjoined parties could "play jurisdictional 'shell games' "; that is, they could "nullify an injunctive decree by carrying out prohibited acts with or through nonparties to the original proceeding." (*Conrad*, *supra*, 55 Cal.App.4th at p. 902.) For that reason,

3

as this court observed more than a century ago, even though injunctions "[o]rdinarily" run only to the named parties in an action, it is "common practice to make the injunction run also to classes of persons through whom the enjoined party may act, such as agents, servants, employees, aiders, abetters, etc., though not parties to the action." (*Berger v. Superior Court* (1917) 175 Cal. 719, 721 (*Berger*).) "[S]uch parties violating its terms with notice thereof are held guilty of contempt for disobedience of the judgment." (*Ibid.*; accord, e.g., *Regal Knitwear Co. v. Board* (1945) 324 U.S. 9, 14.)

But under this general rule, while nonparties may be barred from acting on behalf of, or in concert with, a defendant in violating an injunction, they may not be barred from acting independently. The "whole effect" of the practice, we explained in *Berger*, "is simply to make the injunction effectual against all through whom the *enjoined party* may act, and to prevent the prohibited action by persons acting in concert with or in support of the claim of the *enjoined party*, who are in fact *his* aiders and abetters." (*Berger*, *supra*, 175 Cal. at p. 721.) Put differently, the practice permits a court to punish a nonparty for violating an injunction only "when he has helped to bring about, not merely what the decree has forbidden, because it may have gone too far, but what it has power to forbid, *an act of a party*." (*Alemite*, *supra*, 42 F.2d at p. 833, italics added.) To extend the court's power beyond this point would authorize a court in effect to impose judgment without hearing, a result at odds with basic notions of procedural fairness.

**B.**

In the litigation underlying this appeal, plaintiffs sued defendant Ava Bird for posting allegedly defamatory reviews on Yelp. Bird did not respond, and after a prove-up hearing (Code Civ. Proc., § 585, subd. (b)), the trial court entered a default judgment against her. In addition to awarding other relief, the trial court ordered Bird to remove the offending reviews from Yelp. And then, apparently as

4

backup, the trial court ordered Yelp to do the same.**1** Until this point, Yelp was a stranger to the litigation; it had neither been named as a party nor served with process. And although plaintiffs had previously sent Yelp a copy of the complaint, the complaint neither named Yelp as a party defendant nor notified Yelp of their plans to seek injunctive relief against it. Unsurprisingly, then, Yelp did not participate in the proceedings. It did not learn of the injunction until plaintiffs served it with the court order.

When Yelp was served, it promptly filed a motion to set aside and vacate the judgment. It argued, among other things, that the issuance of the injunction against it violated both due process and section 230. The trial court denied the motion. It reasoned that the injunction against Yelp was proper because Yelp is aiding and abetting Bird's violation of the injunction by, among other things,

_____

**1** In full, the trial court's order reads:

Plaintiffs' Request for Injunctive Relief is Granted. Defendant AVA BIRD is ordered to remove each and every defamatory review published or caused to be published by her about plaintiffs HASSELL LAW GROUP and DAWN HASSELL from Yelp.com and from anywhere else they appear on the internet within 5 business days of the date of the court's order.

Defendant AVA BIRD, her agents, officers, employees or representatives, or anyone acting on her behalf, are further enjoined from publishing or causing to be published any written reviews, commentary, or descriptions of DAWN HASSELL or the HASSELL LAW GROUP on Yelp.com or any other internet location or website.

Yelp.com is ordered to remove all reviews posted by AVA BIRD under user names "Birdzeye B." and "J.D." attached hereto as Exhibit A and any subsequent comments of these reviewers within 7 business days of the date of the court's order.

As the plurality opinion explains, we are here concerned only with the validity of the third paragraph of the order insofar as it requires Yelp to remove specified reviews from its website.

5

allowing the reviews to remain posted on the website. The Court of Appeal affirmed in pertinent part, though it pointedly declined to rely on the trial court's findings that Yelp was aiding and abetting Bird's noncompliance. The trial court's aiding and abetting findings, the Court of Appeal ruled, were "premature" and "also potentially improper to the extent proceedings were conducted without the procedural safeguards attendant to a contempt proceeding." (*Hassell v. Bird* (2016) 247 Cal.App.4th 1336, 1354 (*Hassell*).) Instead, relying on *Berger* and subsequent cases, the court reasoned that the trial court has "the power to fashion an injunctive decree so that the enjoined party may not nullify it by carrying out the prohibited acts with or through a nonparty to the original proceeding," and thus also has the power to direct Yelp "to effectuate the injunction against Bird." (*Hassell*, at pp. 1356–1357.)

The Court of Appeal's reasoning reflects a misunderstanding of the scope of the trial court's power to enjoin a nonparty. The common law rule described in *Berger* would have permitted the court to forbid Yelp and others from acting in concert with Bird, or on Bird's behalf, to violate the court's injunction against Bird. This is what it means to bind individuals "with or through" whom the enjoined party acts. (*Conrad*, *supra*, 55 Cal.App.4th at p. 902.) But because Yelp was not a party to the case, it could not, consistent with the common law rule, be enjoined "from engaging in independent conduct with respect to the subject matter of th[e] suit." (*Additive Controls & Measurement Sys. v. Flowdata* (Fed.Cir. 1996) 96 F.3d 1390, 1395.) Here, the injunction expressly names Yelp and "impose[s] obligations directly on [it]." (*Ibid.*) The injunction requires Yelp to take action, regardless of whether it acts independently of or in concert with Bird in failing to remove the challenged reviews, and "to that extent is in error." (*Ibid.*)[2]

---

**2**    Justice Liu disputes the characterization; he argues that the injunction at issue does not forbid Yelp from engaging in independent conduct with respect to

6

Plaintiffs, as well as Justice Liu, argue that the injunction naming Yelp is valid because it merely makes explicit that Yelp, as an entity "through" whom Bird acts, is obligated to carry out the injunction on her behalf.  (Dis. opn. of Liu, J., *post*, at pp. 4–6.)  But the trial court made no finding that Bird acts, or has ever acted, "through" Yelp in the sense relevant under *Berger*, nor does the record contain any such indication; we have no facts before us to suggest that Yelp is Bird's "agent" or "servant."  (*Berger*, *supra*, 175 Cal. at p. 720.)  It is true and undisputed, as plaintiffs and Justice Liu emphasize, that Bird's statements were posted on Yelp's website with Yelp's permission.  (Dis. opn. of Liu, J., *post*, at p. 6.)  And as a practical matter, Yelp has the technological ability to remove the reviews from the site.  These facts might well add up (at least absent section 230) to a good argument for filing suit against Yelp and seeking an injunctive remedy in the ordinary course of litigation.  But the question presented here is whether these facts establish the sort of legal identity between Bird and Yelp that would justify binding Yelp, as a nonparty, to the outcome of litigation in which it had no meaningful opportunity to participate.  Without more, I do not see how they could.  (Cf., e.g., *Paramount Pictures Corp. v. Carol Pub. Group, Inc*. (S.D.N.Y. 1998) 25 F.Supp.2d 372, 375–376 (*Paramount Pictures*) [denying request to expand the scope of copyright infringement injunction to nonparties merely because the nonparties' conduct " ' may well be found [to render them] directly liable for copyright infringement' "].)[3]

the subject matter of this lawsuit.  (Dis. opn. of Liu, J., *post*, at pp. 4–5.)  But of course it does:  The order requires Yelp to remove Bird's reviews even if, acting entirely independently of Bird, and "solely in pursuit of [its] own interests" (*U.S. v. Hall* (5th Cir. 1972) 472 F.2d 261, 264), Yelp chooses not to (thus potentially incurring its own defamation liability).

[3]     I would note, moreover, that if the trial court had relied on the existence of an agency (or agency-like) relationship as a basis for issuing an injunction directly against Yelp, the company would have been entitled to notice and an opportunity to be heard on that issue.  (See *Zenith*, *supra*, 395 U.S. at p. 111 [invalidating

7

The nature of the injunction, as well as the relationship between Yelp and Bird, distinguishes this case from *Ross v. Superior Court* (1977) 19 Cal.3d 899 (*Ross*), on which the Court of Appeal relied. In *Ross*, an injunction was issued against state officials and their agents, requiring payment of welfare benefits that had been improperly withheld. Although state officials had ordered the counties administering the benefits to make the payments as the injunction required, one county's board of supervisors refused and contempt proceedings were brought against them. The supervisors argued that they could not be bound by the injunction because they were not parties to the underlying action in which the injunction was issued. (*Id.* at pp. 902–903.) This court rejected the argument, explaining that, by statute, counties act on behalf of the state in administering welfare benefits, and thus are bound to carry out an order against the state concerning the administration of the benefits. (*Id.* at pp. 905–909.) In so holding, the court relied on *In re Lennon* (1897) 166 U.S. 548, in which the high court held in contempt a railway employee who refused to move cars of the defendant railway to comply with an injunction against the defendant, despite the defendant's order to do so. (See *Ross*, at p. 905.)

injunction premised on parent company's status as "alter ego" of the defendant, where parent company had no opportunity to be heard].) Yelp received neither.

Justice Liu argues that the injunction against Yelp was properly entered based on its "relationship to Bird's tortious conduct," but notes that Yelp "may yet" raise arguments to the contrary in a contempt proceeding. (Dis. opn. of Liu, J., *post*, at p. 9.) Here, Justice Liu appears to allude to the fact that in California (unlike some other jurisdictions) a person to whom an injunction applies is not barred from collaterally attacking the injunction's validity in a contempt proceeding. (*People v. Gonzalez* (1996) 12 Cal.4th 804, 818 (*Gonzalez*).) This rule does mean that Yelp would have an opportunity to litigate its status as agent or aider and abettor of Bird's noncompliance if the removal order were to stand. But the opportunity to collaterally attack the injunction could not, of course, make up for the court's issuance of an overbroad injunction in the first instance.

8

The Court of Appeal appeared to read *Ross* to mean that a trial court has broad power to enjoin a nonparty with the practical ability to "effectuate" an injunction entered against a party. (*Hassell*, *supra*, 247 Cal.App.4th at p. 1355.) But *Ross* (like *Lennon* before it) stands for a far more limited proposition: A party's agent or servant, *acting in his or her capacity as an agent or servant*, is bound to comply with an injunction against the party. This is because the acts of the agent are imputed to the party; the agent's failure to act as the law demands is the party's failure, and it thus falls within the scope of the court's power to punish. The same is not, however, true of an individual who acts independently. The law draws this distinction, as Judge Hand explained of *Lennon*, "for it is not the act described which the decree may forbid, but only that act *when the defendant does it*." (*Alemite*, *supra*, 42 F.2d at p. 833, italics added.) The nonparty who independently does, or fails to do, what the decree commands is entitled to his or her own day in court.

## C.

Although plaintiffs, like the Court of Appeal, rely largely on a rule concerning a trial court's power to forbid parties from nullifying an injunctive decree by carrying out prohibited acts through nonparties, their real concern does not appear to be that Bird is using or will use Yelp as a pawn to play "jurisdictional 'shell games.' " (*Conrad*, *supra*, 55 Cal.App.4th at p. 902.) Their concern instead appears to be that Bird will simply ignore the injunction—all on her own—and the offending reviews will remain visible unless and until Yelp takes independent action.

The concern is a substantial one, but the usual remedy for such concerns is to sue for a determination of the third party's legal obligation to do as plaintiffs wish. Plaintiffs have identified no instance in which a court has upheld the issuance of an injunction against a nonparty under remotely similar circumstances. Perhaps the closest plaintiffs have come is *U.S. v. Hall*, *supra*, 472 F.2d 261, in which a federal court of appeals upheld the criminal contempt conviction of a

9

nonparty for interference with the operation of a school campus for purposes of obstructing implementation of a desegregation order. The nonparty's actions, the court explained, "imperiled the court's fundamental power to make a binding adjudication between the parties properly before it." (*Id.* at p. 265.) But the court's holding in that case turned on the nonparty's willful obstruction of the defendant's compliance with the court's judgment. (*Ibid.* [distinguishing *Alemite* and *Chase National Bank*]; see also *U.S. v. Paccione* (2d Cir. 1992) 964 F.2d 1269, 1275 [similarly distinguishing *Alemite* because the case before it "dealt with a person who interfered with the *res*, the disposition of which the district court had specifically restricted, and who consciously impeded the rights, obligations and efforts of the parties bound by the court's order from attempting to comply with valid court orders"]; see generally Rest.2d Judgments, § 63 [discussing duty not to obstruct compliance with court judgment].) In this case, there is no argument that Yelp is obstructing Bird's compliance with the court's order; Yelp represents (and we have no reason to doubt) that it will not stand in the way if Bird herself removes the reviews.[4] The concern is instead that Bird is withholding her own compliance, and the question is whether Yelp can be ordered to act independently, even though Yelp has not been served or its own rights adjudicated. Again, plaintiffs have cited no authority that permits that result.

Plaintiffs also argue that the order is proper because Yelp has no independent interest in continuing to publish reviews that have been found by the trial court to be defamatory (albeit in a case to which Yelp was not a party). Yelp and its amici vigorously disagree, arguing that it has a protected First Amendment interest in the publication of the reviews, separate and apart from Bird's own

---

[4]    As a practical matter, that Bird can independently effectuate the judgment further distinguishes *Ross*, *supra*, 19 Cal.3d 899, where the defendant "could comply with the provisions of the . . . order requiring the payment of retroactive welfare benefits *only through* the actions of county welfare departments." (*Id.* at p. 909, italics added.)

10

authorial interest, that has not yet been adjudicated. (Cf., e.g., *New York Times Co. v. Sullivan* (1964) 376 U.S. 254 [discussing First Amendment rights of both the authors of a newspaper advertisement and the newspaper that published it]; *Taylor v. Sturgell* (2008) 553 U.S. 880, 892–893 ["A person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit," and therefore ordinarily is not bound by the judgment.].)  We need not definitively resolve this controversy here, however, because it is incontestable that Yelp has an interest in avoiding a court order, backed by the threat of contempt sanctions, requiring it to do something it does not believe it is legally obligated to do.  Whether Yelp is right or wrong about the nature of its obligations is beside the point.  A person may be wrong and nevertheless entitled to his or her day in court.

## D.

So far, I have described common ground with Justice Cuéllar's dissenting opinion.  Justice Cuéllar does not defend the trial court's decision to issue an injunction against Yelp in a proceeding to which it was not a party, and he would vacate the Court of Appeal's judgment upholding that order.  (Dis. opn. of Cuéllar, J., *post*, at pp. 34–39.)  Justice Cuéllar would, however, remand for consideration of whether the injunction *against Bird* can be enforced against Yelp because the company has aided and abetted, or otherwise acted in concert with, Bird in her violation of the court's injunction.  (*Id.* at p. 39.)

I agree with Justice Cuéllar that this is the pertinent standard under *Berger* and related cases, but I do not believe a remand is warranted to consider whether Yelp has aided and abetted Bird's noncompliance with the court's order against her.  The question before us concerns only the validity of the injunction entered *against Yelp*.  To be sure, after that injunction issued, the trial court later concluded that Yelp had also aided and abetted the violation of the injunction against Bird and could be ordered to remove the reviews for that reason.  But as noted, the Court of Appeal held that these aiding and abetting findings were both

11

"premature" and "also potentially improper" to the extent they were made in the context of Yelp's legal challenge to the validity of the judgment, and without the procedural protections to which Yelp would have been entitled in a contempt proceeding. (*Hassell*, *supra*, 247 Cal.App.4th at p. 1354; cf. *Gonzalez*, *supra*, 12 Cal.4th at p. 816 [contempt proceedings are "considered quasi-criminal, and the defendant possesses some of the rights of a criminal defendant"]; *Blockowicz v. Williams* (7th Cir. 2010) 630 F.3d 563, 568 (*Blockowicz*) ["Actions that aid and abet in violating the injunction must occur after the injunction is imposed[.]"]; *Paramount Pictures*, *supra*, 25 F.Supp.2d at p. 375 ["Nor does an injunction reach backwards in time to action taken prior to the time it was issued."].) Plaintiffs have not challenged the Court of Appeal's holding on this point. That holding does not preclude plaintiffs from instituting further proceedings if they believe Yelp has engaged in relevant post-order evasive conduct, or from seeking appropriate clarification of the scope of the injunction against Bird, but it does foreclose reliance on an aiding and abetting theory to validate the order enjoining Yelp in the first instance. And for present purposes, the conclusion that the injunction against Yelp is invalid is a complete answer to the issue presented to us.

To the extent the question might arise in the future, however, I offer a cautionary note. The difficulties with the trial court's aiding and abetting analysis extend beyond matters of timing and procedure. The trial court in this case reasoned, among other things, that Yelp is aiding and abetting Bird's violation of the injunction simply by failing to remove Bird's reviews from the website. But this establishes only that Yelp has not stepped forward to act despite Bird's noncompliance. That is not aiding and abetting. (See *Blockowicz*, *supra*, 630 F.3d at p. 568 [concluding that Internet service provider's refusal to comply with an injunction was "mere inactivity" that was "simply inadequate to render them aiders and abettors in violating the injunction"]; see also *Conrad*, *supra*, 55 Cal.App.4th at p. 903 [before a nonparty can be punished for violating the terms of an injunction, it must be shown that the nonparty has acted "*with or for* those who

12

are restrained"; "some actual relationship with an enjoined party is required" and "[m]ere 'mutuality of purpose' is not enough"].)  Put differently:  The mere fact that Yelp has not removed Bird's reviews from its website is not reason enough to avoid litigating the question whether Yelp does, in fact, have a legal obligation to remove the reviews from its website, in a forum in which Yelp has a meaningful opportunity to be heard.[5]

**II.**

In my view, these basic common law principles suffice to decide the case. The plurality opinion, however, decides the matter on a different ground.  It holds that the trial court's order directing Yelp to remove the reviews from the website is barred by Yelp's statutory immunity under section 230.  Although I believe it is unnecessary to reach the section 230 question, I agree with the plurality opinion's conclusion given the particular circumstances of this case:  Even if it were permissible to issue an injunction against Yelp solely because it once permitted Bird to post her reviews and has the ability to remove them, the proceedings would be barred by section 230.

Two subsections of section 230 form the basis of the immunity Yelp claims in this case.  First, section 230, subsection (c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  Second, section 230, subsection (e)(3) provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  Together, "[t]hese provisions have been widely and

---

[5]　In his dissent, Justice Cuéllar suggests other "evidence and interactions" that perhaps might support a finding that a website operator or other Internet platform acted as an aider and abettor.  (Dis. opn. of Cuéllar, J., *post*, at pp. 35–36.)  We have not received full briefing on this question, and I express no view on it.  I do, however, caution that even when the common law permits the enforcement of an injunction against a third party aider and abettor, other sources of law, including section 230, may not.  (Cf. plur. opn., *ante*, at p. 25.)

consistently interpreted to confer broad immunity against defamation liability for those who use the Internet to publish information that originated from another source." (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 39 (*Barrett*).)

In an early, influential discussion of section 230, the Fourth Circuit interpreted the provision to forbid any legal obligation that "would place a computer service provider in a publisher's role." (*Zeran v. America Online, Inc.* (4th Cir. 1997) 129 F.3d 327, 330.) The language of *Zeran* might be read to suggest that a court could *never* order a website to remove third party content, since any such order would necessarily interfere with the website's choices about what content to publish. But section 230 immunity has not been thought to sweep quite so broadly. *Barnes v. Yahoo!, Inc.* (9th Cir. 2009) 570 F.3d 1096 is illustrative. There, the Ninth Circuit concluded that section 230 immunity precluded a plaintiff's claim of negligence against the website Yahoo for failure to take down fake profile accounts purporting to be the plaintiff, but did not preclude a claim of promissory estoppel based on Yahoo's failure to fulfill a promise to remove the material. (*Barnes*, at pp. 1104–1109.) The Ninth Circuit reasoned that the plaintiff's promissory estoppel claim "does not seek to hold Yahoo liable as a publisher or speaker of third party content, but rather as the counter-party to a contract, as a promisor who has breached." (*Id*. at p. 1107.) Liability on the latter claim, the court explained, "would come not from Yahoo's publishing conduct, but from Yahoo's manifest intention to be legally obligated to do something, which happens to be removal of material from publication." (*Ibid*.)

Distilling the available authorities, section 230 immunity applies to an effort to bring a cause of action or impose civil liability on a computer service provider that derives from its status as a publisher or speaker of third party content. This reading of the statute is consistent with the policies articulated in influential cases interpreting section 230 immunity such as *Zeran* and reiterated in the plurality opinion: Section 230 forbids a cause of action or the imposition of liability when the effect is to impose liability for, or draw the provider into

14

litigation to defend, its past editorial judgments (or lack thereof) in permitting third party postings. But section 230 does not bar a cause of action solely because the result might be a court order requiring the provider, as the publisher of the posting in question, to take steps to remove it.

In each of the cases cited in the plurality opinion, the court applied section 230 to bar the filing of a lawsuit seeking to hold an interactive computer service responsible for offending posts written by a third party. This case concerns a different scenario. In this case, plaintiffs have filed no lawsuit against Yelp and have pursued no substantive claim against it. The injunction, as narrowed to Bird's past reviews, on its face does not seek to draw Yelp into litigation to second guess or penalize Yelp for its initial decision to post Bird's reviews, despite their defamatory content. As plaintiffs emphasize, the injunction instead requires only that, now that the reviews have been found by a court to be defamatory, Yelp remove the reviews. The injunction of course recognizes that Yelp is—as a matter of fact—the publisher of Bird's reviews; the reviews cannot come down without Yelp's cooperation. But that is not the pertinent question. The question is instead whether the injunction necessarily holds Yelp legally responsible for, or otherwise authorizes litigation against Yelp solely because of, its editorial choices.

As the case comes to us, I agree with the plurality opinion that the answer to that question is yes. The justification plaintiffs offer for the issuance of the injunction is that Bird acted with Yelp's permission in posting her reviews on its website, and Yelp has the ability to remove them even if Bird chooses not to. This means, as the plurality opinion says, that plaintiffs are proceeding against Yelp based on nothing more than its role as a publisher of third party content. (Plur. opn., *ante*, at pp. 22–25.) As such, the only distinction between this case and a lawsuit seeking to hold Yelp civilly liable for granting this permission to third party users—which, as all agree, would unquestionably be barred by section 230 immunity—is plaintiffs' decision not to name Yelp as a party (and thus, as plaintiffs would have it, to save Yelp the trouble of defending itself). But for

15

reasons I have already explained, plaintiffs' decision cannot deprive Yelp of its opportunity to be heard on the propriety of the injunction against it. The distinction in procedure thus ultimately makes no difference. Either way, plaintiffs have drawn Yelp into litigation solely because of its past decision to allow Bird to post her reviews. Even if the trial court otherwise had the power to issue an injunction against Yelp solely on that basis, the proceedings would be barred by section 230.

I would, however, stop there; I venture no opinion as to how section 230 might apply to other take-down orders based on different justifications. I understand the plurality opinion's application of section 230 to be similarly limited. The plurality opinion "recognize[s] that not all legal duties owed by Internet intermediaries necessarily treat them as the publishers of third party content, even when these obligations are in some way associated with their publication of this material"; it instead holds that, on the record before us, "Yelp is inherently being treated as the publisher of the challenged reviews, and it has not engaged in conduct that would take it outside section 230's purview in connection with the removal order." (Plur. opn., *ante*, at pp. 24–25.) This restraint is, I believe, appropriate here. Section 230 is often credited with giving rise to the modern Internet as we know it, but the broad sweep of section 230 immunity also has "troubling consequences." (*Barrett*, *supra*, 40 Cal.4th at p. 40; see *id.* at pp. 62–63.) Section 230, as broadly construed, has brought an end to a number of lawsuits seeking remedies for a wide range of civil wrongs accomplished through Internet postings—including, but not limited to, defamation, housing discrimination, negligence, securities fraud, cyberstalking, and material support of terrorism. (See, e.g., *Jane Doe No. 1 v. Backpage.com, LLC* (1st Cir. 2016) 817 F.3d 12, 19 [citing cases]; *Pennie v. Twitter, Inc.* (N.D.Cal. 2017) 281 F.Supp.3d 874, 888–889.) Whether to maintain the status quo is a question only Congress can decide. But at least when it comes to addressing new questions about the scope of section 230 immunity, we should proceed cautiously, lest we

16

inadvertently forbid an even broader swath of legal action than Congress could reasonably have intended.

## III.

I, like my colleagues, am sympathetic to plaintiffs' dilemma. Plaintiffs have proved to the satisfaction of the trial court that Bird's critical Yelp reviews are false; Bird has yet to comply with the court's order to remove the reviews; and section 230 forbids them from suing Yelp to require it to remove the reviews if Bird fails to do so. But as I see it, issuing an injunction directly against Yelp, without affording it a meaningful opportunity to be heard, is not an available alternative. Plaintiffs' understandable desire to circumvent section 230 does not permit us to cast aside either the " ' "deep-rooted historic tradition that everyone should have his own day in court," ' " or the fundamental due process principles on which that tradition rests. (*Richards v. Jefferson County* (1996) 517 U.S. 793, 798.) I therefore join the plurality opinion in concluding that Yelp's motion to vacate the injunction against it should have been granted.


**KRUGER, J.**

**DISSENTING OPINION BY LIU, J.**


The court expresses "sympathy" for those who have been defamed on the Internet, including plaintiffs Dawn Hassell and the Hassell Law Group, who won a lawful judgment against defendant Ava Bird for defamatory reviews that Bird posted on Yelp. (Plur. opn., *ante*, at p. 32; see conc. opn. of Kruger, J., *ante*, at p. 17.) But Hassell is not seeking sympathy. She is seeking a remedy for the damage done to her and her law firm. The trial court provided that remedy in the form of damages against Bird and an injunction ordering both Bird and Yelp to remove the defamatory reviews, and the Court of Appeal affirmed. However, more than four years after the trial court issued its order, Bird's defamatory reviews remain posted on Yelp. Bird has refused to comply with the injunction, and Yelp claims it is under no legal obligation to comply. Today's decision agrees with Yelp, thereby ensuring that Hassell will continue to suffer reputational harm from the unlawful postings unless Bird is somehow made to comply.

This "dilemma" (conc. opn. of Kruger, J., *ante*, at p. 17) is one of the court's own making. As Justice Cuéllar explains, today's extension of the Communications Decency Act of 1996 (47 U.S.C. § 230) (section 230) to immunize Yelp is not supported by case law or by the statute's text and purpose. (Dis. opn. of Cuéllar, J., *post*, at pp. 7–29.) Section 230 does not immunize Yelp from this removal order issued by a California court in a case where "[n]o claim was ever brought against Yelp seeking defamation or tort liability for its editorial

1

decisions." (Dis. opn. of Cuéllar, J., *post*, at p. 18.) Decisions like *Zeran v. America Online, Inc.* (4th Cir. 1997) 129 F.3d 327 are inapposite because they involved lawsuits filed *directly* against providers of interactive computer services for tort liability. In *Barrett v. Rosenthal* (2006) 40 Cal.4th 33 (*Barrett*), we relied on those decisions to conclude that "section 230 exempts Internet intermediaries from defamation liability for republication." (*Id.* at p. 63.) We rested our holding on the understanding that "[s]ubjecting service providers to notice liability would defeat 'the dual purposes' of section 230, by encouraging providers to restrict speech and abstain from self-regulation. [Citation.] A provider would be at risk for liability each time it received notice of a *potentially defamatory* statement in any Internet message, requiring an investigation of the circumstances, a legal judgment about the defamatory character of the information, and an editorial decision on whether to continue the publication." (*Barrett* at p. 45, italics added.) We emphasized that "[a]ny investigation of a *potentially defamatory* Internet posting is . . . a daunting and expensive challenge." (*Id.* at p. 57, italics added.) Our opinion repeatedly explained that section 230 is intended to protect service providers from investigation and litigation burdens arising from notice of users' "potentially" defamatory statements. (*Id.* at pp. 44–46, 55, 57.)

These concerns are not present in this case. No one has burdened Yelp with defending against liability for potentially defamatory posts. Here, the trial court ordered Yelp to remove postings that have been *already adjudicated* to be defamatory. Hassell sued Bird, not Yelp, and the litigation did not require Yelp to incur expenses to defend its editorial judgments or any of its business practices. The trial court ruled that Bird had defamed Hassell on Yelp, and it directed Yelp to help effectuate the remedy. Yelp's conduct as a speaker or publisher was never at issue in Hassell's lawsuit, and the trial court imposed no liability on Yelp for such conduct. Instead, the trial court enjoined Yelp as part of the remedy for

2

*Bird's* tortious conduct toward Hassell.  A company in Yelp's position may face burdens associated with determining the "validity or scope" of a removal order or "the manner in which it is implemented."  (Plur. opn., *ante*, at p. 29.)  But these are not the type of burdens contemplated by *Barrett* or the cases upon which *Barrett* relied in explaining the purpose of section 230 immunity.

As for Yelp's due process claim, the Court of Appeal properly clarified that the question here is "whether the trial court was without power to issue the removal order *in the first instance*."  (*Hassell v. Bird* (2016) 247 Cal.App.4th 1336, 1357, italics added.)  The matter before us is Yelp's motion to vacate the trial court's judgment; this is not a contempt proceeding or other action seeking to impose liability on Yelp for violating the injunction.  (*Ibid.* [Yelp's postjudgment conduct "has no bearing on the question" presented].)  Justice Kruger argues that the removal order directed at Yelp violates due process because Yelp was never given its "own day in court" before the order was issued.  (Conc. opn. of Kruger, J., *ante*, at p. 9.)  She cites Judge Learned Hand's opinion in *Alemite Manufacturing Corp. v. Staff* (2d Cir. 1930) 42 F.2d 832 (*Alemite*) for the proposition that a court generally cannot "bind any one but a party" and "cannot lawfully enjoin the world at large."  (*Id.* at p. 832; see conc. opn. of Kruger, J., *ante*, at p. 3.)

But "[g]eneral propositions do not decide concrete cases" (*Lochner v. New York* (1905) 198 U.S. 45, 76 (dis. opn. of Holmes, J.)), and the facts of *Alemite* are instructive.  The plaintiff there won a patent infringement suit against John Staff and obtained an injunction "against John, 'his agents, employees, associates and confederates,' enjoining them from infringing, or 'aiding or abetting or in any way contributing to the infringement.' "  (*Alemite*, *supra*, 42 F.2d at p. 832.)  "At the time of the suit [John's brother] Joseph was a salesman for John, but later, having left his employ, he set up in business for himself, and was proved to have

3

infringed the patent. The plaintiff then began proceedings in the original suit to punish Joseph for contempt, asserting that he was bound by the decree, and that his new business was a violation of the writ." (*Ibid.*) The Second Circuit held that the injunction in the action against John could not extend to Joseph's new act of infringement. (*Id.* at p. 833.) Noting that "[t]he District Judge found that John 'had no connection or part whatever in the acts of contempt hereby adjudged against Joseph Staff'" (*id.* at p. 832), Judge Hand explained that "[t]he District Court had no more power in the case at bar to punish [Joseph] than a third party who had never heard of the suit" (*id.* at p. 833).

The injunction in *Alemite* could not reach Joseph, a nonparty, because his infringement of the same patent was entirely independent of John's original act of infringement. It was in *that* sense that Judge Hand said Joseph was a stranger to the underlying suit. The same is not true here. The trial court did not enjoin Yelp " 'from engaging in independent conduct with respect to the subject matter of th[e] suit.' " (Conc. opn. of Kruger, J., *ante*, at p. 6.) Yelp was directed to remove Bird's defamatory reviews of Hassell, the very subject matter of the underlying suit. The trial court did not enjoin Yelp from posting any other defamatory reviews of Hassell, even if such reviews were identical to Bird's. This is fully consistent with Judge Hand's admonition that "it is not the act described which the decree may forbid, but only that act *when the defendant does it*." (*Alemite*, *supra*, 42 F.2d at p. 833.) The defendant here is Bird; the unlawful acts are Bird's defamatory reviews; and the injunction directs Yelp to remove only Bird's defamatory reviews, not anyone else's. The removal order illustrates the rule that an injunction may extend to a nonparty "when [the nonparty] has helped to bring about . . . what [the injunction] has power to forbid, an act of a party." (*Ibid.*)

In saying that the removal order enjoins Yelp from engaging in "independent conduct," Justice Kruger strays from the meaning of that term as

4

used in the cases she cites. (See *Additive Controls & Measurement Sys. v. Flowdata* (Fed.Cir. 1996) 96 F.3d 1390, 1395 (*Flowdata*); *Paramount Pictures Corp. v. Carol Pub. Group, Inc*. (S.D.N.Y. 1998) 25 F.Supp.2d 372, 375–376 (*Paramount Pictures*).) In those cases, as in *Alemite*, a plaintiff obtained an injunction against one or more defendants for patent or copyright infringement and thereafter sought to bind nonparties to the injunction based on the nonparties' acts of infringement. This was prohibited, the courts explained, because the nonparties had engaged in *their own* acts of infringement separate and apart from the defendants' infringing acts that were the subject of the injunction. (See *Flowdata*, at pp. 1395–1397; *Paramount Pictures*, at pp. 375–376.) "Independent conduct" in this context means conduct by a nonparty that is allegedly unlawful *independent of the defendant's wrongdoing*; it does not encompass conduct by a nonparty that *facilitates the defendant's wrongdoing*. Indeed, *Flowdata* recognized — with no misgivings about due process — that courts have authority to issue a directive to a nonparty when " 'necessary or appropriate to effectuate and prevent the frustration of orders' " directed at a party. (*Flowdata*, at p. 1396, quoting *U.S. v. New York Tel. Co.* (1977) 434 U.S. 159, 172 [court may require telephone company to cooperate with installation of pen register device].) *Alemite*, *Flowdata*, and *Paramount Pictures* would be more on point if the trial court had ordered Yelp to remove identical reviews posted by people other than Bird. But the removal order targets only the reviews written by Bird, the defendant in the underlying suit.

This court long ago observed that "it has been a common practice to make the injunction run also to classes of persons through whom the enjoined party may act, such as agents, servants, employees, aiders, abetters, etc., though not parties to the action, and this practice has always been upheld by the courts, and any of such parties violating its terms with notice thereof are held guilty of contempt for disobedience of the judgment." (*Berger v. Superior Court* (1917) 175 Cal. 719,

5

721 (*Berger*).)  Justice Kruger doubts that "Bird acts, or has ever acted, 'through' Yelp in the sense relevant under *Berger*" (conc. opn. of Kruger, J., *ante*, at p. 7) and suggests that Yelp's conduct here is merely passive.  But such a characterization of Yelp's role blinks reality.

If Bird had gone to the town square every day to shout defamatory comments about Hassell, or if Bird had made those comments to 50 friends, it is doubtful this case would be here today.  Instead, Bird posted a review on Yelp, a website that attracts tens of millions of visitors every month.  Yelp is an interactive service provider dedicated to inviting people like Bird to post reviews of local businesses and inviting users to search, sort, and read those reviews (all while exposing website visitors to advertisements).  Yelp formats the reviews, makes the reviews searchable, and aggregates reviews of each business into a rating from one to five stars.  Yelp's Terms of Service make clear to reviewers that "[w]e may use Your Content in a number of different ways, including publicly displaying it, reformatting it, incorporating it into advertisements and other works, creating derivative works from it, promoting it, distributing it, and allowing others to do the same in connection with their own websites and media platforms."  The Terms of Service also state that Yelp owns "visual interfaces, interactive features, graphics, design, compilation, including, but not limited to, our compilation of User Content and other Site Content, computer code, products, software, aggregate user review ratings, and all other elements and components of the Site excluding Your Content, User Content and Third Party Content."

The treatment of user comments by other websites may be more passive, and I do not suggest that any website that posts user comments may be subject to a removal order like the one here.  But Yelp's relationship with reviewers like Bird is not passive.  Even if Yelp was not Bird's agent or servant (cf. *Ross v. Superior Court* (1977) 19 Cal.3d 899, 905–909 (*Ross*); *Ex parte Lennon* (1897) 166 U.S.

6

548, 555–556), it is evident that Bird acted through Yelp in the most relevant sense: It was Bird's defamation of Hassell, facilitated by Yelp's willing and active participation, that the trial court sought to enjoin. The removal order directed at Yelp is an example of the "common practice" of "mak[ing] the injunction effectual against all through whom the enjoined party may act, and to prevent the prohibited action" — here, the continued display of Bird's defamatory reviews on Yelp — "by persons acting in concert with or in support of the claim of the enjoined party." (*Berger*, *supra*, 175 Cal. at p. 721, italics omitted.)

Justice Kruger suggests that whether Bird acted through Yelp in a manner that made Yelp a proper subject of the injunction is an issue on which Yelp had a right to notice and an opportunity to be heard before the injunction issued. (Conc. opn. of Kruger, J., *ante*, at p. 7, fn. 3.) But I agree with the Court of Appeal that "a trial court does have the power to fashion an injunctive decree so that the enjoined party may not nullify it by carrying out the prohibited acts with or through a nonparty to the original proceeding." (*Hassell v. Bird*, *supra*, 247 Cal.App.4th at p. 1357.)

Again, *Alemite* is instructive. After obtaining an injunction "against John, 'his agents, employees, associates and confederates,' enjoining them from infringing, or 'aiding or abetting or in any way contributing to the infringement,' " the aggrieved plaintiff initiated an action "to punish Joseph for contempt, asserting that he was bound by the decree" as a nonparty within the ambit of the injunction's terms. (*Alemite*, *supra*, 42 F.2d at p. 832.) It is true that Joseph had notice and an opportunity to be heard in the contempt proceeding, and he convinced the district court that his new act of infringement had no connection to John's prior act of infringement that was the subject of the injunction. But suppose the district court had concluded otherwise and found Joseph in contempt. That determination would rest on the premise that the injunction validly applied to

7

Joseph *when it was issued* (provided he had notice of it, which he did). If Joseph could not have been bound by the injunction because he had no notice or opportunity to be heard before it was issued, then he could not have been punished for contempt under any scenario. Joseph could only have been bound by a *new* injunction after being heard on the nature of his conduct; he could not have been punished for violating the *existing* injunction. Yet *Alemite* provides no support for this view. Instead, Judge Hand recognized the validity of punishing a nonparty who "has helped to bring about" the prohibited act of a party as a narrow exception to the general rule that an injunction can apply only to persons who have had "their day in court." (*Id.* at p. 833.)

In *Ross*, *supra*, 19 Cal.3d 899, we rejected the local supervisors' claim that they could not be held in contempt for violating an injunction directed at state officials and their " 'agents' " (*id.* at p. 906) because they were not parties to the suit in which the injunction was issued and "received no notice and were afforded no opportunity to defend that action" (*id.* at p. 905). We determined that the local supervisors were, by statute, "agents" of the state officials for purposes of administering welfare benefits, notwithstanding the supervisors' arguments to the contrary. (*Id.* at pp. 906–909.) The supervisors had no opportunity to present their arguments that they were not "agents" of the state before the injunction issued — yet we upheld the finding of contempt because they "wilfully refused to comply with the judgment." (*Id.* at p. 904.) In other words, the injunction was binding on the supervisors *when issued*, even though they had no notice or opportunity to be heard beforehand. Justice Kruger does not explain how, under her view, the supervisors in *Ross* could have been bound.

The only difference here is that the injunction names Yelp instead of using a general phrase to refer to nonparties (e.g., "Bird's agents, employees, associates, confederates, aiders and abettors") as in *Alemite* and *Ross*. But that makes no

8

difference to the due process inquiry. Yelp may yet argue in a contempt proceeding that its relationship to Bird's tortious conduct was not sufficient to justify the trial court's removal order. But if that argument were to fail, the fact that Yelp — like the supervisors in *Ross* — had no notice or opportunity to be heard before the trial court issued the injunction would not preclude a finding of contempt. Such a finding would necessarily mean the injunction was valid when issued.

Finally, the nature of Yelp's relationship to Bird that makes Yelp a proper subject of the injunction is not that of a "publisher or speaker" for purposes of section 230 immunity. Yelp's obligation to remove Bird's defamatory reviews does not stem from any judgment as to the legality of any editorial decision by Yelp to publish Bird's speech. As noted, the only issue in the underlying suit was whether Bird, not Yelp, had defamed Hassell and her firm; the suit did not impose on Yelp any burdens of defending itself against liability for "potentially defamatory" statements. (*Barrett*, *supra*, 40 Cal.4th at p. 45.) Whether Yelp could claim section 230 immunity in a contempt proceeding on the ground that its continued refusal to remove Bird's reviews is a matter of editorial judgment, notwithstanding a state court judgment finding the reviews defamatory, is a matter not before us.

The Court of Appeal got it right: Yelp has no statutory immunity from the removal order, and the removal order directed at Yelp does not violate due process of law. I would affirm the judgment of the Court of Appeal.

**LIU, J.**

9

**DISSENTING OPINION BY CUÉLLAR, J.**

Even — indeed, perhaps especially — in a society that values free expression, people expect courts and statutes to offer them minimal protections from disparaging misrepresentations or abject lies deliberately circulated to the public. Today's plurality opinion does not. Despite clear evidence that the federal Communications Decency Act of 1996 (47 U.S.C. § 230 (hereafter section 230))[1] was no trump card letting providers of "interactive computer service" (§ 230(f)(2)) such as Internet platforms evade responsibility for complying with any state court order involving defamation or libel, the plurality opinion posits that our state's protections against the willful spread of false, damaging information are just not compatible with the Internet. In reaching this conclusion, the plurality opinion unfortunately misconstrues the Communications Decency Act and misapplies our precedent. It also runs the risk of misjudging the consequences of implying, in the early 21st century, that protections from libel, defamation, so-called "revenge porn," and similar actions are plenty available except, of course, where they arguably matter most: on the digital network that gives a lone voice in the public square a megaphone loud enough to be heard in the most remote corners of the planet.

In fact, the question this case presents is as novel as it is important — one undecided by this court or any other. We must resolve whether section 230 grants an interactive computer service provider immunity from complying with a

---

[1] Undesignated references are to section 230.

1

properly issued state court order, and if not, under what circumstances a court may require such a service provider to remove posted information that a court has found defamatory. At core this case implicates a dispute not only about defamation on the Internet, but about whether a court can fashion an effective remedy that applies to Internet platforms. The plurality opinion is right to recognize that this question depends crucially on section 230 — but it also implicates due process principles, as well as California law governing court issued injunctions.

Yet the plurality opinion's answer to this question follows almost entirely from its analysis of section 230. Remarkably, it asserts that section 230 alone prevents a California court from directing Yelp, Inc. (Yelp) to remove from its website statements that have been judicially adjudged defamatory. The plurality opinion expands this court's precedent to reach its conclusion and authorizes interactive computer service providers to flout California court orders by asserting section 230 immunity. In doing so, the plurality opinion endangers victims of torts committed online, impermissibly limits the remedies available to Californians who rely on our state courts for protection, and sanctions a rule bereft of justification under California or federal law, with troubling implications for an Internet-dependent society.

To the extent the plurality opinion maintains that section 230 acts as an absolute bar to this long-standing application of California law, we disagree — and so does a majority of the court. The plurality opinion's analysis of section 230 is no more compelled by the statutory language of section 230, the legislative history of the statute, or any previous case law broadly interpreting section 230 than it is by anything in California law. Although it explicitly addresses only section 230, the plurality opinion nonetheless concludes that there is no remedy for Dawn L. Hassell and her law firm, even through an injunction extended to Yelp. (Plur. opn., *ante*, at p. 32.) We disagree.

2

To provide the nuanced analysis necessary for resolution of the question before us, we identify the circumstances under which a California court may properly enjoin an interactive service provider. A California court has such power if it is wielded appropriately and in the right circumstances. Even in the context of this case, Justice Liu's opinion posits an injunction might be properly enforced against an interactive service provider. (See dis. opn. of Liu, J., *ante*, at pp. 8-9.) And as Justice Kruger explains, section 230 does not necessarily foreclose a state court from specifically naming and enjoining an interactive service provider, provided courts observe proper procedural safeguards. (Conc. opn., *ante*, at pp. 11-12, 14-16.)

We also contemplate a different situation in our analysis — one specifically raised by Yelp before the Court of Appeal and in its petition for review. Our analysis addresses whether the injunction, issued against Ava Bird and directing her to remove her defamatory posts from Yelp.com, may run to Yelp. We conclude that, under proper conditions, it may. Although the trial court in this case did not make sufficiently clear findings supporting the conclusion that Yelp acted as an agent of or conspirator with Bird, or aided and abetted her, circumstances may indeed arise where a nonparty interactive service provider is found to have developed such a close entanglement of interests — based on the provider's behavior before the injunction, and having received sufficient notice and opportunity to participate in the litigation.

What this case does *not* implicate is the kind of situation where section 230 does confer immunity — against a cause of action filed directly against the platform, seeking to hold it liable for conduct as the *publisher* of third party content. (Plur. opn., *ante*, at p. 14, citing *Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 39 (*Barrett*).) Our view diverges from the plurality opinion's conclusion that section 230 protects an Internet platform from complying with a state court order simply because the platform operates as the publisher of third party speech. We find no reason to read section 230 as categorically protecting an interactive service

provider from responsibility to comply with a properly issued injunction from a California court.  Underlying our conclusion is what we take to be the most sensible reading of the relevant statutory terms and structure, precedent and persuasive case authority, and practical considerations grounded in the statutory purpose as well as California law.

In pressing its argument to the contrary — that courts effectively have no power to affect what information an Internet platform posts — Yelp raises a variety of procedural and constitutional concerns.  We take these concerns seriously, because fair adjudication and due process protections depend on an opportunity to be heard before a court for parties whose interests are at stake.  But after careful review and reflection on applicable California and federal law, we do not believe Yelp offers a persuasive argument why the trial court is powerless to order removal of posted information by an interactive service provider that aids and abets the underlying violation.  We also affirm a long-standing principle of California law that permits an injunction to run to a nonparty, where it has aided, abetted, or acted in concert with or support of the enjoined party to violate the terms of the injunction.  We disagree with the plurality opinion's apparent assertion that section 230 categorically preempts the power of California courts to enforce injunctive remedies on nonparties because of their status as publishers. (Plur. opn., *ante*, at p. 25.)  What we conclude instead is that Yelp may not assert blanket immunity under section 230, where no cause of action has been filed against and no liability has been imposed upon it as the speaker or publisher of third party content.

### I.

Dawn L. Hassell and the Hassell Law Group (collectively, Hassell) filed suit against their former client, Ava Bird, on April 10, 2013.  They alleged that Bird posted "factually inaccurate and defamatory remarks" about Hassell on Yelp.com.  Although Yelp was not named as a defendant in Hassell's lawsuit,

4

Hassell sent copies of the complaint to Yelp via fax and e-mail on May 15, 2013. In their prayer for relief, Hassell sought damages and injunctive relief prohibiting Bird from continuing to defame Hassell as well as removal of every defamatory review Bird published about Hassell from Yelp's website and anywhere else on the Internet.

Bird never filed an answer to Hassell's complaint. She did, however, file a request with the San Francisco Bar Association to mediate the lawsuit. Hassell attempted to engage in mediation with Bird, but Bird was nonresponsive to the assigned mediator's scheduling requests. Hassell requested an entry for default judgment on July 11, 2013, which included a declaration regarding Hassell's service on Bird. Hassell's notice of hearing and application for default judgment was filed on November 1, 2013, and the hearing was scheduled for January 14, 2014. Bird failed to appear at the hearing on Hassell's application for default judgment, and the superior court swore-in, examined, and accepted evidence from Dawn Hassell.

The superior court granted Hassell a default judgment against Bird, awarding over $550,000 in damages and an injunction requiring Bird to remove the defamatory reviews about Hassell from Yelp.com and anywhere else they appeared on the Internet. The default judgment entered in favor of Hassell on January 14, 2014, stated: "Plaintiffs' Request for Injunctive Relief is Granted. Defendant AVA BIRD is ordered to remove each and every defamatory review published or caused to be published by her about plaintiffs HASSELL LAW GROUP and DAWN HASSELL from Yelp.com and from anywhere else they appear on the internet within 5 business days of the date of the court's order. [¶] Defendant AVA BIRD, her agents, officers, employees, or representatives, or anyone acting on her behalf, are further enjoined from publishing or causing to be published any written reviews, commentary, or descriptions of DAWN HASSELL

5

or the HASSELL LAW GROUP on Yelp.com or any other internet location or website. [¶] Yelp.com is ordered to remove all reviews posted by AVA BIRD under user names 'Birdzeye B.' and 'J.D.' attached hereto as Exhibit A and any subsequent comments of these reviewers within 7 business days of the date of the court's order." Hassell served Yelp's general counsel and its national registered agents with a copy of the judgment on January 15, 2014. Yelp's director of litigation responded by letter, asserting that Yelp would not comply with the injunction. Yelp informed Hassell that it could not be bound by the injunction, was immune from compliance with the order under section 230, and that Hassell improperly served Bird and failed to sufficiently prove defamation.

More than four months later, Yelp inserted itself into this case by filing a motion to vacate the superior court's default judgment as to Bird. On August 27, 2014, Yelp received a hearing on its motion to vacate the judgment against Bird. In its papers and at the hearing, Yelp argued that section 230 barred the injunction and that it could not be bound by the injunction as an agent or aider and abettor to Bird. The superior court found a factual basis to support Hassell's contention that Yelp aided and abetted Bird's violation of the injunction and included no discussion of section 230 in its order denying Yelp's motion to vacate the judgment against Bird. Yelp appealed.

The Court of Appeal held that the injunction could be enforced against Yelp, and rejected Yelp's argument that section 230 granted it immunity from any responsibility to comply with the injunction. (*Hassell v. Bird* (2016) 247 Cal.App.4th 1336, 1356-1357, 1365 (*Hassell*).) Addressing Yelp's challenge to the injunction directing it to remove posts from its website, the Court of Appeal held that under California law, an injunction can be applied to nonparties in appropriate circumstances. (*Id*. at p. 1355, citing *Ross v. Superior Court* (1977) 19 Cal.3d 899 (*Ross*).) The court reasoned that these principles of California law

6

undermined Yelp's theory that the trial court lacked authority to include in the judgment against Bird a provision ordering Yelp to effectuate the injunction against Bird by deleting her defamatory reviews. (*Id.* at p. 1356.) Yelp argued it was insulated from any responsibility to comply with an injunction issued against Bird, because the evidence did not establish that Yelp aided and abetted Bird's violation of the injunction. The court concluded that the specific aiding and abetting issue taken up by the trial court in this case had no bearing on whether the trial court, in principle, had authority to issue the injunction in the first place. (*Id.* at p. 1357.) The court held that California law "establishes that a trial court has the power to fashion an injunctive decree so that the enjoined party may not nullify it by carrying out the prohibited acts with or through a nonparty to the original proceeding." (*Ibid.*)

Yelp petitioned this court for review. It asked us to resolve two related issues: whether California law authorizes an injunction to extend to a nonparty online publisher, and whether section 230 prevents a court from enjoining and directing a website publisher to remove third party content from its website. We granted Yelp's petition for review.

## II.

Time and again in the course of its extensive participation in this litigation, Yelp urged the court to embrace a specific reading of section 230. That reading would categorically shield Yelp from responsibility to comply with any conceivable injunction issued by the superior court. Only by conjuring immunity from a statute that does not provide it to advance a purpose putatively derived from a statute that does not embrace it can Yelp expect its argument on this score to persuade. We address Yelp's contention that section 230 prohibits a California court from crafting and effectuating an injunction that directs a website publisher

7

to take specific action, including a directive to remove from its website content judicially deemed defamatory.

Yelp's own interpretation of section 230 is essentially the one embraced by the plurality opinion: that this provision works to immunize interactive service providers that post third party information or derivative content from compliance with state court orders that implicate their status as the publisher of third party content. The terms of section 230 lend no support to this interpretation. Enacted in 1996 as part of the Communications Decency Act, section 230 is entitled "Protection for private blocking and screening of offensive material." None of the terms included in section 230 suggest an immunity trump card from state court orders lurking in the statute's midst. Section 230 describes certain protections and obligations of interactive computer services, like Yelp. Section 230(a), "Findings," reflects that section 230 was adopted at a time of rapid development of the Internet, and with Congress's express recognition that Americans increasingly rely on the Internet for political, educational, cultural, and entertainment purposes. (§ 230(a).) The policy priorities described in section 230(b) demonstrate a concern with addressing objectionable and offensive material available online. In addition to policies encouraging the promotion, continued development, and preservation of the competitive free market for the Internet, the statute specifically enunciates policies to encourage the development of technologies that maximize user control over information received through the Internet and to remove disincentives for developing and utilizing blocking and filtering technologies to limit children's access to objectionable or inappropriate online content. (§ 230(b).) None of the policies within section 230(b) state or suggest an express immunity from compliance with state court orders.

The title of section 230(c) is "Protection for 'Good Samaritan' blocking and screening of offensive material." What section 230(c)(1) provides is this: "No

8

provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Section 230(c)(2) explains that providers or users of interactive computer services shall not be liable for actions taken in good faith to restrict access to obscene, harassing, or objectionable material, regardless of whether such material is constitutionally protected, or for efforts to make available technology that restricts such material. (§ 230(c)(2)(A)-(B).) Section 230(c) does not endow Internet platforms with a complete immunity from compliance with state court orders. Rather, it enunciates protections where offensive material is voluntarily restricted, blocked, or screened. Section 230(d) outlines the obligations of interactive service providers to provide notification regarding parental control protections that assist a customer in limiting minors' access to harmful online material. (§ 230(d).) And section 230(e) explains that section 230 has no effect on certain federal and state laws. (§ 230(e).) Section 230(e)(3), which pertains to state and local laws, is particularly relevant here. It states only: "Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." (§ 230(e)(3).)

Because of the website it runs, Yelp is one of the entities functioning as a provider of interactive computer service. Such entities have both certain protections and responsibilities under the statute. (§ 230(d), (f)(2); see also *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC* (9th Cir. 2008) 521 F.3d 1157, 1162, fn. 6 (*Roommates.com*) ["Today, the most common interactive services are websites"].) And Bird, the creator of information posted on Yelp.com, is an "information content provider" as a person "responsible, in whole or in part, for the creation or development of information" provided through the Internet or a website like Yelp. (§ 230(f)(3).) Hassell, the victims of

9

defamation, filed their claim only against Bird — the originator of the defamatory speech — and not against Yelp, an interactive service provider. No cause of action or claim was ever filed against Yelp as an interactive service provider. (See § 230(e)(3).) Rather, Yelp's participation in this case was at its own demand, through a motion to invalidate Hassell's default judgment against Bird. The question is whether Yelp may assert section 230 immunity where the only cause of action relevant to this case was brought against Bird directly and no legal claim or liability is levied against Yelp.

By its terms, section 230 conspicuously avoids conferring complete immunity from all legal proceedings. Its language expressly permits the enforcement of certain federal criminal laws as well as state laws consistent with the section. (§ 230(e).) In the context of state law, the section 230 only prohibits causes of action from being brought and liability from being imposed under state laws that are inconsistent with the section. (§ 230(e)(3).) From the statute's terms, an inconsistent state law is one in conflict with the terms in section 230(c). An inconsistent state law under section 230(c)(1) is a state law cause of action or liability that treats an interactive computer service as the publisher or speaker of information provided by another information content provider. And an inconsistent state law under section 230(c)(2) is a state law cause of action that seeks to hold an interactive service provider liable for voluntary actions taken in good faith to restrict access to obscene, lewd, harassing, or otherwise objectionable material. If section 230 conferred complete immunity on an interactive service provider, as the plurality opinion implies, then lurking somewhere in the statute one would need to find an enormously consequential codicil of categorical absolution written in invisible ink to preempt the statute's more nuanced scheme.

10

There's no such codicil. Nor does Yelp even face "liability" here at all. (See § 230(e)(3).) The plurality opinion treats compliance with the court order pertaining to Bird's defamatory speech as a kind of liability against Yelp, arguing that liability is a broad legal term. (Plur. opn., *ante*, at pp. 26-27, citing Black's Law Dict. (6th ed. 1990) p. 914 (Black's 6th ed.).) But we define liability under section 230 as the term of art that it is in our legal system — meaning a financial or legal obligation, such as a duty of care under tort law, the breach of which gives rise to a tort lawsuit — that treats a service provider or user as the publisher or speaker of third party content. We find support for this interpretation in the commonly understood definition of "liability." (See Webster's 9th New Collegiate Dict. (1989) p. 687 [defining liability as "something for which one is liable; *esp*, *pl* : pecuniary obligations : DEBTS"]; see also Black's Law Dict. (10th ed. 2014) p. 1053 [defining "liability" as "being legally obligated or accountable" or a "financial or pecuniary obligation in a specified amount."].) As the plurality opinion readily acknowledges, "liability" was understood at the time the statute was enacted to include the imposition of damages. Indeed, it was defined at the time "to mean: all character of debts and obligations." (Black's 6th ed., *supra*, at p. 914.)

So liability in this context is best understood as a type of financial obligation, such as the responsibility to pay damages arising from a successfully-litigated tort suit. This conclusion is bolstered by our own decisions, together with cases from other jurisdictions and the history of the statute at issue that liability in this context is essentially a type of financial obligation. (*Id*. at p. 1055 [defining "tortious liability" as "redressable by an action for compensatory, unliquidated damages" and in some cases "by extracompensatory or punitive damages"].) As the plurality opinion acknowledges, in *Barrett*, this court explained that "Congress intended to create a blanket immunity from tort liability for online republication of

11

third party content" (*Barrett*, *supra*, 40 Cal.4th at p. 57) and was specifically concerned with compelling regulation of service providers "at the sword point of tort liability" (*id*. at p. 53). We specifically cited subsequent legislative history affirming that Congress's purpose was to protect providers from liability *for tort claims*. (*Id*. at p. 54, citing H.R.Rep. 107-449, 2d Sess., p. 5 (2002) ["The courts have correctly interpreted section 230(c), which was aimed at protecting against liability for such claims as negligence"].) One of the first cases to interpret section 230, *Zeran v. America Online, Inc.* (4th Cir. 1997) 129 F.3d 327, 330 (*Zeran*), explained that "Congress recognized the threat that tort-based lawsuits pose" and the purpose of the statutory immunity was to prohibit the "imposition of tort liability on service providers" in a burgeoning Internet. *Zeran*, on which the plurality opinion relies, expressed that section 230 was enacted to prevent the imposition of "tort liability on service providers for the communication of others." (*Zeran*, at p. 330.) This focus on tort liability suggests that Congress understood "liability" to mean tort liability, and supports our definition of liability as a financial obligation, like damages.

The federal courts of appeals have also readily acknowledged Congress's concern with preventing *tort liability* against Internet platforms for third party speech. (See *Jane Doe No. 1 v. Backpage.com, LLC* (1st Cir. 2016) 817 F.3d 12, 23 [explaining that in enacting section 230, Congress chose to prohibit " 'tort liability on companies that serve as intermediaries for other parties' potentially injurious messages' "]; see also *Doe v. Internet Brands* (9th Cir. 2016) 824 F.3d 846, 852 [reasoning that section 230 is concerned with " 'the imposition of tort liability on companies that do not create potentially harmful messages' " but are merely intermediaries].) The injunction issued by the superior court does not demand any financial obligation of Yelp. The underlying judgment and award of damages pertains only to Bird and no damages or financial obligation are sought

from Yelp. The only possible financial obligation Yelp might face would result from contempt proceedings and no such proceedings have occurred here.

All of which underscores why it is a contrast between apples and oranges — or apples and Oreos, for that matter — to compare a defendant's explicit targeting by a civil lawsuit with a person or entity's remedial responsibility to avoid helping others engage in prohibited conduct. A defendant to a state law cause of action may be subject to an adverse judgment triggering a responsibility to provide monetary or equitable relief to the plaintiff, and may incur litigation expenses to defend itself. In contrast, an entity that has not been sued is required only to refrain from engaging in prohibited actions. Yelp has not been sued, and its only responsibility in light of the judgment and injunction against Bird is to avoid violating that court order. Section 230 does not extend protection to a provider or user who violates an injunction by instead promoting third party speech that has been deemed unlawful by a California court. Yelp has an obligation not to violate or assist in circumventing the injunction against Bird, but that does not impose a legal obligation upon Yelp that treats it as a publisher or speaker of third party content. As we explained in *Barrett*, interactive service providers and users are exempt under section 230 "from defamation liability for republication." (*Barrett*, *supra*, 40 Cal.4th at p. 63.) We enunciated our concern that "subjecting Internet service providers and users to defamation liability would tend to chill online speech" as central to our holding that users and providers may not be sued directly and held liable for distributing defamatory speech. (*Id*. at p. 56.) But we did not interpret section 230 to expand its protections to a provider that acts in concert with another party to violate a court order or engage in prohibited acts. That sort of interaction would eliminate the "publisher" immunity contemplated in section 230(c)(1) and (e)(3). (See *Barrett*, at p. 63 (conc. opn. of Moreno, J.) [reasoning that publishers who conspire with original content

13

providers "would not be covered by the immunity provided by. . . section 230(c)(1) and (e)(3)"].)

The plurality opinion belittles the state court injunction here as the result of a "tactical decision." The plurality implies the injunction is part and parcel of a nefarious "litigation strategy" advanced by Hassell solely to circumvent section 230. (Plur. opn., *ante*, at p. 22.) Using this lens, the plurality elides the distinction between causes of action filed directly against interactive service providers that seek injunctive relief and state court orders that contain injunctions. The few cases addressing injunctive relief did not extend section 230 immunity to a provider or user seeking to evade compliance with an injunction. Rather, those cases barred causes of action filed directly against the provider or user where the claims sought injunctive relief as a remedy. (See *Kathleen R. v. City of Livermore* (2001) 87 Cal.App.4th 684, 698 (*Kathleen R.*) [reasoning that "even if for purposes of section 230 'liability' means only an award of damages [citation], the statute by its terms also precludes other causes of action for other forms of relief" such as taxpayer actions and claims for declaratory and injunctive relief filed directly against a provider or user]; see also *Medytox Solutions, Inc. v. Investorshub.com, Inc.* (Fla.Dist.Ct.App. 2014) 152 So.3d 727, 731 (*Medytox*) [concluding that section 230 "encompasses the claims for declaratory relief and injunctive relief" filed *directly against* the interactive service provider].) These cases lend no support to the plurality opinion's assertion that a provider or user may invoke section 230 immunity to avoid compliance with an injunction, where no cause of action or claim has been filed. All of this makes it difficult at best to conclude that section 230's statutory terms somehow imply an unbounded immunity to a service provider, where no cause of action is lodged against it and no liability, meaning a financial or legal obligation that treats Yelp as the publisher of third party content, is sought.

14

Given the plurality opinion's embrace of an approach to section 230 that is not compelled or even much supported by the statutory terms, it is unsurprising that it is also an interpretation that does not follow from our precedent. And to the extent the plurality opinion concludes that section 230 operates as a blanket immunity for interactive service providers to disregard California court orders, it fails to garner support from a majority of the court. Just once before did this court consider section 230, in *Barrett*. What our opinion in that case addressed is only whether the federal statute grants the distributor of allegedly defamatory material immunity from a defamation lawsuit. (*Barrett*, *supra*, 40 Cal.4th at p. 39 ["We granted review to decide whether section 230 confers immunity on 'distributors' "].) Our holding was limited to an interpretation of section 230 that "does not permit Internet service providers or users to be sued as 'distributors,' nor does it expose 'active users' to liability." (*Barrett*, at p. 63.) *Barrett* did not squarely consider whether an interactive service provider may avoid compliance with a properly issued state court order. We cannot rely solely upon it or any other precedent to resolve this case, but it remains instructive as we analyze, more broadly, the statute's breadth and limitations.

To reach our limited holding in *Barrett*, we weighed the meaning of section 230(c)(1) and (e)(3) together. We explained that "[t]hese provisions have been widely and consistently interpreted to confer broad immunity against defamation liability for those who use the Internet to publish information that originated from another source." (*Barrett*, *supra*, 40 Cal.4th at p. 39.) Our reasoning in *Barrett* is consistent with the view that interactive service providers may invoke section 230 immunity to protect themselves from certain causes of action or liabilities, such as those seeking defamation liability based on the provider's publication or distribution of defamatory speech. (*Barrett*, at p. 63 ["section 230 exempts Internet intermediaries from defamation liability for republication"].) A plaintiff

15

might file a state law defamation cause of action against an interactive service provider — one treating the provider "as the publisher or speaker" of "information provided by another information content provider," as described in section 230(c)(1). Under section 230(e)(3), a provider may escape that cause of action or avoid the liability sought in the plaintiff's claim. *Barrett* instructs that a defamation claim filed against Yelp for acting as the "distributor" of Bird's speech would be barred by section 230. But no such claim was filed against Yelp in this case.

*Barrett* clarified that a plaintiff aggrieved by defamatory speech must file its cause of action against the original speaker. We instructed that the proper procedure to address defamation in Internet publications is for plaintiffs "to pursue the originator of a defamatory Internet publication" and observed that "further expansion of liability must await congressional action." (*Barrett*, *supra*, 40 Cal. 4th at p. 63.) Hassell followed the procedure described in our prior opinion by filing their claims against Bird, the originator of the defamatory statements. In line with our directive, Hassell did not bring a cause of action for liability against Yelp. Hassell's lawsuit against Bird, the information content provider, fits with section 230's terms and our prior opinion.

In *Barrett* we found section 230 immunity protected an interactive computer service user sued directly for defamation liability. We held only that "by its terms section 230 exempts Internet intermediaries from defamation liability for republication." (*Barrett*, *supra*, 40 Cal.4th at p. 63.) *Barrett* specifically contemplated a state law tort claim filed against an interactive computer service user, which we deemed was inconsistent with section 230 because the defamation claim against the user sought to hold the user liable for defamatory speech authored by a third party. Whatever else is true of *Barrett*, it does not compel a finding that Yelp may invoke section 230 immunity where it is not the subject of a

16

state law tort claim and where no liability is sought from Yelp for third party speech.  The immunity that Yelp desires is conferred only when a state law claim is brought or a liability imposed that is inconsistent with section 230 because it regards the provider or user as the speaker of third party speech.  (§ 230(c)(1), (e)(3).)  Because these necessary conditions are not present in this case, we conclude that Yelp may not assert unlimited immunity where no cause of action or liability is imposed against it as the speaker or publisher of third party information.

This conclusion fits with what we held in *Barrett*.  Congress's purpose was "to create a blanket immunity from tort liability for online republication of third party content." (*Barrett*, *supra*, 40 Cal.4th at p. 57.)  Here, Hassell do not seek tort liability from Yelp for republishing Bird's content.  Rather, Hassell filed suit directly against Bird, seeking liability in money damages and injunctive relief against Bird as the speaker and originator of the defamatory speech.  As Yelp quotes in its opening brief, " 'Plaintiffs who contend they were defamed in an Internet posting may only seek recovery from the original source of the statement.' " (Quoting *Barrett*, at p. 58.)  Hassell did exactly that.

Yelp and the plurality opinion are left to rely on nonbinding case law from other jurisdictions — addressing markedly distinct circumstances — to support their strained interpretation of section 230.  Yelp relies on the Fourth Circuit decision in *Zeran*, which held that lawsuits against interactive service providers seeking to hold the provider liable for decisions to publish, withdraw, postpone, or alter content are barred under section 230.  (*Zeran*, 129 F.3d at p. 330).  *Zeran* assessed a provider's immunity from a state tort claim and the Fourth Circuit's holding does not conflict with our reading of section 230.  There, the victim of defamatory posts on an America Online (AOL) message board filed claims against AOL, an interactive service provider.  (*Zeran*, at pp. 329, 332.)  The plaintiff did not bring a cause of action against the poster of the offensive messages, but

instead sought to hold AOL liable for the third party's defamatory speech. (*Id*. at pp. 329-330.) Addressing whether AOL could assert section 230 as an affirmative defense to the claims against it, the court reasoned that "[section] 230 creates a federal immunity to *any cause of action* that would *make service providers liable* for information originating with a third party user of the service." (*Zeran*, at p. 330, italics added.) What the court addressed is section 230 immunity for tort claims filed against an interactive service provider, not immunity for a claim against the originator of the defamatory speech. Under these facts, the court reasoned that websites faced with "lawsuits seeking to hold a service provider liable" for the decision to publish, withdraw, or alter content, may enjoy section 230 immunity. (*Zeran*, at p. 330.) *Zeran*'s holding is inapposite here, where Hassell filed their claim against the speaker of the defamatory speech, and not Yelp, as the interactive service provider. No claim was ever brought against Yelp seeking defamation or tort liability for its editorial decisions. Yelp and the plurality opinion's extension of section 230 immunity to any circumstance in which a service provider exercises a publisher's traditional editorial functions goes beyond the federal court's holding in *Zeran*.

Yelp and the plurality opinion also cite *Barnes v. Yahoo!, Inc.* (9th Cir. 2009) 570 F.3d 1096 (*Barnes*), a Ninth Circuit case that considered state law claims brought against an interactive service provider. (*Id*. at p. 1099.) This Ninth Circuit opinion provides a framework to assess whether a cause of action filed against a provider seeks to treat the provider as a publisher or speaker of third party information. But applying the framework offered in *Barnes* to the instant case does not compel the conclusion that section 230 grants complete immunity to a provider seeking to evade compliance with a state court order.

Plaintiff Barnes's ex-boyfriend created and posted fake online profiles of Barnes on a website run by Yahoo. The profiles featured naked photographs and

18

solicitations to engage in sexual intercourse. (*Barnes*, *supra*, 570 F.3d at p. 1098.) In accordance with Yahoo's policy, Barnes submitted a signed statement that she did not create the profiles, requested their removal, and included the required supporting documentation. She was eventually contacted by Yahoo's director of communications who assured her Yahoo would "take care of" her removal request. (See *id.* at pp. 1098-1099.) Barnes claimed she relied on that statement and took no further action. Two months later, still with no word from Yahoo, Barnes filed a lawsuit against Yahoo alleging a state law tort claim for negligent undertaking and a state law contract claim for promissory estoppel. Yahoo argued it was immune from liability under section 230.

The Ninth Circuit first explained that no provision of section 230 "declares a general immunity from liability deriving from third party content." (*Barnes*, *supra*, 570 F.3d at p. 1100.) The court rejected Yahoo's assertion that section 230(c)(1) granted blanket immunity from any liability arising from third party information and read section 230(c)(1) and (e)(3) together, explaining that (e)(3) makes the terms of (c)(1) explicitly relevant, as "(c)(1) only protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." (*Barnes*, at pp. 1100-1101.) The Ninth Circuit defined the inquiry for section 230 immunity as "whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." (*Barnes*, at p. 1102.) The court "must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker,' " and if so, section 230 precludes liability. (*Barnes*, at p. 1102.)

Neither description of this test from *Barnes* carries the day for Yelp. *Barnes*'s assessment was limited to a claim filed against a provider and conceived

19

of section 230 immunity only where that defendant provider was sued as liable for third party speech. This analysis addresses a claim or theory of recovery filed against the defendant — not a third party, as in the instant case. The causes of action here are Hassell's defamation claims against Bird. The court must assess whether those causes of action "treat the defendant as the 'publisher or speaker' of content provided by another." (*Barnes*, *supra*, 570 F.3d at p. 1102.) The answer is no. Bird, as the defendant, is treated as the speaker of her own speech. Hassell's claims were filed against the party they seek to hold liable: Bird. Hassell does not seek to hold *Yelp* liable as the publisher of Bird's content. That Yelp functions as a publisher of Bird's speech does not in itself grant Yelp complete immunity under section 230. The liable party, who is subject to the defamation liability judgment, is Bird — not Yelp. Hassell's claim against Bird for defamation does not treat Yelp as a publisher or speaker of Bird's speech. No immunity exists under section 230 under these circumstances.

What the test in *Barnes* treats as critical is whether the *defendant's* acts relate to the *defendant's* status or conduct as a publisher or speaker. Yelp suggests this test should be manipulated to ask whether the duty Yelp (*a nonparty*, and not a defendant) violated derives from Yelp's status or conduct as a publisher or speaker. This reformulation of the *Barnes* test does nothing to advance Yelp's position. Yelp's duty is not the result of its status or acts as a publisher. Yelp's duty is to refrain from violating the injunction or assisting Bird in evading the injunction. (See *Barnes*, *supra*, 570 F.3d at p. 1107 [reasoning that liability "would come not from Yahoo's publishing conduct, but from Yahoo's manifest intention to be legally obligated to do something, which happens to be removal of material from publication"].) Yelp's obligation could arise from a valid conclusion that it aided and abetted unlawful conduct or a subsequent contempt proceeding. Neither of these amounts to a direct claim alleging Yelp engaged in

20

defamation or the publication or distribution of defamatory speech.  Again we find no support for far-reaching conclusions about section 230 immunity.

Yelp also claims the Court of Appeal misread section 230(e)(3) by construing it to limit the broad immunity allegedly established by 230(c)(1).  Yelp argues that *Barnes* concluded that section 230(c)(1), by itself, shields from liability all publication decisions, including whether to post or remove content generated by third parties.  We are not persuaded by Yelp's argument, and a careful reading of the discussion in *Barnes* shows why.  The Ninth Circuit's statement was not an assertion that state law claims may be barred solely on authority conferred by section 230(c)(1).  As previously discussed, the Ninth Circuit framed its assessment under section 230 as an interplay between section 230(c)(1) and (e)(3).  And this sentence cited by Yelp was just one statement within a longer discussion about the separate roles of section 230(c)(1) and (2).  (See *Barnes*, *supra*, 570 F.3d at p. 1105 ["A closer look at the whole of section 230(c), we believe, makes sense of this apparent contradiction.  Subsection (c)(1), by itself, shields from liability all publication decisions, whether to edit, to remove, or to post, with respect to content generated entirely by third parties.  Subsection (c)(2), for its part, provides an additional shield from liability. . . ."].)

The plurality opinion posits that the trial court's order overrules Yelp's decision to post the defamatory review and is therefore barred by section 230.  (Plur. opn., *ante*, at pp. 22-24.)  But the plurality's conclusion doesn't follow from its premise, because section 230 no more preempted all state law governing injunctions than it preempted all state law governing defamation.  Yelp's obligation here is to refrain from violating the injunction issued against Bird.  An obligation not to act in concert or with an enjoined party to violate the terms of an injunction is not a cause of action or a financial or legal obligation treating Yelp as the publisher or speaker of Bird's speech.  This obligation does not hold Yelp to

21

account for its publication decisions such that it is treated as the publisher of Bird's speech. It holds Yelp accountable for aiding, abetting, or acting in concert with or support of Bird as the enjoined party. The plurality opinion purportedly recognizes Hassell obtained a default judgment and injunction against Bird, and acknowledges that California law requires nonparties to comply with injunctions in appropriate circumstances. What it seems to overlook are the implications of these observations when section 230 is read correctly and no due process problems exist: that the provision of the injunction directing Bird to remove her defamatory posts could run to Yelp and similarly situated entities. (*Id*. at p. 23.)

The plurality opinion acknowledges that even under its reading of section 230, Yelp could conceivably be forced to comply with an injunction. (Plur. opn., *ante*, at pp. 23-24.) Of course it can, but our focus is on the issue most directly raised by this case — the injunction provision directing Bird to remove her defamatory posts, and whether that injunctive duty may be enforced against Yelp. Our conclusion is that section 230 does not categorically ban enforcement of the injunction against Bird, Yelp, or similarly situated entities.

Yelp and its supportive amici curiae cite other nonbinding cases to press the case for Yelp's complete immunity under section 230. These cases are distinguishable from the issue at hand because they addressed defamation liability claims or causes of action filed directly against an Internet service provider or user. As we have explained, no cause of action was filed against Yelp as an interactive service provider. Relying on these cases, Yelp petitions for an expansion of section 230 immunity beyond what this court or any other has previously held. That a certain kind of injunction may be barred by section 230 does not compel a conclusion or even strongly imply that service providers are immune from compliance with any properly issued injunction simply because they are service providers as defined in the statute.

22

Nowhere in section 230 or anywhere else in the Communications Decency Act is there support for the conclusion that injunctions issued by state courts are categorically barred. Yelp and the plurality opinion cite a California Court of Appeal opinion and a case from an appellate court in Florida as evidence that section 230 prohibits interactive service providers and users from being enjoined. (Plur. opn., *ante*, at pp. 16-18, 27-28.) This nonbinding case law permitting section 230 immunity for service providers and users sued directly for injunctive relief is not determinative of this case.

*Kathleen R.* addressed state law claims filed against an interactive service provider seeking injunctive relief and damages. Relying on section 230(e)(3), the Court of Appeal explained that "claims for declaratory and injunctive relief are no less causes of action than tort claims for damages, and fall squarely within the section 230(e)(3) prohibition." (*Kathleen R.*, *supra*, 87 Cal.App.4th at p. 698.) Notably, the court in *Kathleen R.* did not rely solely on the terms of section 230(c)(1) to assert a complete immunity; rather, the court looked expressly to the section 230(e)(3) requirement that no causes of action may be brought and no liabilities may be imposed against interactive service providers. The claims were barred, not because the plaintiff sought injunctive relief, but because she brought causes of action *against a service provider directly*. Our understanding of section 230 does not conflict with *Kathleen R*: Under section 230(c)(1) and (e)(3), section 230 immunity may apply to a state law claim filed against a provider that seeks injunctive relief. We find no support to go further and interpret section 230 as immunizing websites from having to comply with any properly issued state court injunction.

Nor does Yelp or the plurality opinion's reliance on *Medytox* compel such a conclusion. That Florida court of appeal decision addressed an action for declaratory and injunctive relief against Investorshub.com, an interactive service

23

provider.  (*Medytox*, *supra*, 152 So.3d at p. 729.)  Medytox sued Christopher

Hawley for defamation and tortious interference after he posted statements about

Medytox on Investorshub.com.  (*Ibid.*)  Medytox requested that Investorshub.com

remove Hawley's posts, which contained "allegedly defamatory statements" about

Medytox.  (*Ibid.*)  Investorshub.com removed two of the posts and Medytox sued

Investorshub.com for failure to remove all of the allegedly defamatory postings.

(*Ibid.*)

The court reasoned that section 230(e)(3) "precludes not only 'liability,' but

also causes of action for other forms of relief" based on state or local law.

(*Medytox*, *supra*, 152 So.3d at p. 731.)  The court explained that "[a]n action to

force a website to remove content on the sole basis that the content is defamatory

is necessarily treating the website as a publisher, and is therefore inconsistent with

section 230."  (*Ibid.*)  That plaintiffs filed an action directly against an interactive

service provider seeking removal of third party information was an essential fact

supporting the court's conclusion.  *Medytox* imposed a different burden from that

presented here:  a burden on the provider to defend itself against a cause of action

seeking liability for third party speech.  No claim was filed against Yelp seeking

damages or injunctive relief based on posts written by Yelp users.  *Medytox*

provides no persuasive or controlling authority in favor of Yelp's position.

What we find more instructive are practical considerations — ones

consistent with the Communications Decency Act and to some extent motivated

the federal statute.  These remain vital as we consider the powers of a sovereign

jurisdiction whose authority has not been explicitly curbed.  Our proposed reading

of section 230 supports the statute's purpose to protect service providers from state

law causes of action and liabilities that treat the provider as the publisher or

speaker of third party speech.  Here, no cause of action seeks to hold Yelp liable

for its publication of Bird's speech.  We instead address a court ordered solution

for a victim of defamation that does not infringe section 230's protections from state law causes of action and liabilities against providers for acting as publishers or speakers of third party speech. California citizens rely on the power of our courts to protect and vindicate their rights. Our interpretation recognizes that the statute does not prohibit court crafted remedies for victims of harmful Internet content. The plurality opinion is incorrect in its assertion that allowing the injunction against Bird to run to nonparty Yelp would contravene Congress's intent to protect providers from defending against claims that treat them as a publisher or speaker of third party content. (Plur. opn., *ante*, at pp. 29-31.) Yelp thrust itself into this case by petitioning the superior court to vacate the defamation judgment that Hassell obtained against Bird. The court order against Bird determined the specifically identified posts were defamatory and should be removed. The superior court's determination regarding Bird's defamation liability was just that — a determination about Bird's defamation liability, not a claim against Yelp requiring it defend itself against a civil lawsuit. In its own terms of service, Yelp conveys that it engages in removal of posts, specifying that it can "remove, screen, edit, or reinstate User Content from time to time at our sole discretion for any reason or no reason, and without notice to you. For example, we may remove a review if we believe it violates our Content Guidelines." Yelp's terms of service specifically contemplate the removal of defamatory posts, as their content guidelines caution users against posting content "that is false, intentionally misleading, or defamatory." Yelp could have simply removed the posts, in accordance with its terms of service, without incurring any significant litigation cost or burden. Nothing is excessively burdensome as a matter of law about the removal of posts a California court has deemed defamatory, even if Yelp would much prefer to wash its hands of this responsibility.

Instead Yelp chose to initiate legal proceedings. It did so by petitioning the court, on its own motion, to vacate a judgment against a party with whom Yelp claims it shares no interests.[2] Yelp did so in order to claim complete immunity under section 230 and assert defenses on Bird's behalf. Insofar as Yelp desired a venue through which to defend its own speech interest, Yelp's speech and original content are not protected by section 230. Providers may only assert immunity from causes of action brought against them that treat the provider as the publisher or speaker of content provided by *other* information content providers — not content generated by the service provider itself. (See § 230(c)(1), (e)(3).) And when Yelp created an opportunity to assert its own speech interest, it instead argued that Hassell failed to sufficiently prove her defamation claim and subverted the First Amendment rights of Yelp users, as third parties. Yelp argued that Hassell failed to provide Bird adequate notice of the defamation lawsuit, made insufficient efforts to locate Bird, and failed to prove that Bird authored the posts at issue. Yelp now claims that it was entitled to an opportunity to be heard regarding its own speech interest before the judgment and injunction against Bird were entered.

The plurality opinion posits that our interpretation of section 230 creates incentives for plaintiffs to provide little or no prejudgment notice to service providers and users. (Plur. opn., *ante*, at pp. 30-31.) What the plurality opinion fails to recognize are procedural safeguards embedded in the process governing when an injunction against a party defendant may run to a nonparty like Yelp.

---

[2]     Although this issue is not before us, and Yelp has not chosen to challenge this finding, the Court of Appeal determined that "Yelp is not aggrieved by the default judgment against Bird" — the judgment that Yelp sought to vacate. (*Hassell*, *supra*, 247 Cal.App.4th at p. 1348.) Yelp's decision to initiate judicial proceedings under Code of Civil Procedure section 663, and to incur the costs associated with its motion to vacate the judgment, was self-imposed.

26

Under California law, the injunction against Bird may only run to Yelp where Yelp has actual notice of the injunction. Under this scenario, notice to Yelp occurs before the injunction may be extended, and there is no danger of disincentivizing the provision of notice. Even in situations where an injunction might conceivably run to a nonparty based on pre-injunction conduct, the record must reflect sufficient entanglement of interests and action to warrant a finding of aiding and abetting under *Berger v. Superior Court* (1917) 175 Cal. 719 (*Berger*) and *Ross*, and the nonparty would otherwise need sufficient notice and opportunity to participate in accordance with due process principles. (*Ross*, *supra*, 19 Cal.3d at p. 906; *Berger*, 175 Cal. at p. 721.) That Yelp in this case had considerable notice and opportunity to participate in the proceedings underscores that these requirements do not categorically prevent responsibility for removal of defamatory information from being imposed on a nonparty on the basis of its pre-injunction conduct. (See *Ross*, 19 Cal.3d at p. 909.)

Given the range of circumstances where state law may properly impose responsibility on an entity such as Yelp without imposing "liability," we question whether it was within the ambit of congressional purpose that the statute preclude any effective remedy for people defamed or injured by Internet content. Recall that here, Bird failed to ever respond in the superior court proceedings. The record indicates that she was aware of the lawsuit addressing her posts, as evidenced by her request to the San Francisco Bar Association for mediation, but she refused to defend her speech in court or comply with the judgment or injunction. Bird is also apparently judgment proof. The underlying facts of this case are far from unique, and many aggrieved Californians may find themselves in similar circumstances. Nothing in the legislative history supports the idea, implicit in the plurality opinion's position, that Congress reasonably sought to deprive victims of defamation and other torts committed online of any effective remedy.

27

Our reading of section 230 takes account of what it means, practically, to let providers spurn state court orders. It considers as well the statute's express directive that section 230 shall not be construed to prevent a state from enforcing laws consistent with the section. (§ 230(e)(3).) At core, the plurality opinion reads as though it finds section 230 a definitive barrier to imposing any injunctive responsibility on service providers. (Plur. opn., *ante*, at pp. 31-32.) That reading of section 230 would render state courts incapable of providing effective relief to their citizens when providers make "editorial" decisions that permit defamatory or injurious speech to remain on the Internet, even where that speech has been deemed unlawful. A complete immunity for interactive service providers under section 230 would preclude remedies for victims of defamation where the content providers are unavailable, like in circumstances of absentia or death, and where the website operator is unsympathetic. Victims would be without recourse where, as here, the service provider refuses to remove content even when that content violates the provider's terms of service. And under the expansive immunity Yelp demands, harmful statements that could be retracted or removed if made in print could remain online indefinitely with no recourse.

These concerns loom especially large in the context of the modern Internet. The Internet has the potential not only to enlighten but to spread lies, amplifying defamatory communications to an extent unmatched in our history. The resulting injuries to individuals' reputational interests from defamation, revenge porn, and similar content can be grave and long-lasting, and negative effects on businesses can be equally or more severe. Speakers on the Internet can reach huge audiences across the country and internationally, and the perpetuation of fake, defamatory, and harmful content has implications for critical social issues, including consumer protection, personal safety, disaster and violence prevention, and government independence. The plurality opinion contends that we advance an interpretation of

28

section 230 that threatens the promotion of online discourse and thwarts Congress's intent. (Plur. opn., *ante*, at pp. 30-31.) Not so. Online freedom is not so fragile that its existence depends on eviscerating courts' power to protect people from defamatory information or other communications lacking lawful protection. Indeed, under our interpretation, a nearly infinite range of interactions online remain available — ones that do not involve the spread of information courts have found defamatory or otherwise unprotected by law. Our reading of section 230 recognizes Congress's concerns regarding the availability of objectionable and inappropriate online material and its interest in encouraging interactive computer service providers to voluntarily restrict access "in good faith" to material that is obscene, lewd, harassing, or otherwise objectionable, regardless of whether such material is constitutionally protected. (§ 230(c)(2).) That concern makes the plurality opinion's conclusion particularly ironic: it construes a statute entitled "Protection for private blocking and screening of offensive material" as one meant to promote the limitless perpetuation of offensive online content, rather than to protect the voluntary removal and screening of such material. We conclude instead that section 230 does not endow an interactive service provider with absolute immunity from complying with a court order that includes injunctive relief simply because it functions as a publisher.

## III.

Our analysis of section 230 lends further importance to a procedural and remedial question Yelp raised in its petition: may an injunction be extended to a nonparty website acting in concert with an enjoined party? From Yelp's vantage point, the answer is a simple no. Hassell's injunction against Bird therefore may not be enforced against Yelp as a nonparty. We disagree. California law is clear that injunctions may be enforced against a nonparty that has notice of the

29

injunction and aided, abetted, or otherwise acted in concert with or support of the enjoined defendant to violate the injunction.

California's long-standing practice is to allow enforcement of injunctions against certain nonparties — and rightly so. *Berger* is the seminal case from this court regarding injunctions against nonparties. Injunctions are typically binding on the parties to the action and their successors. But an injunction may be enforced against a nonparty in order to prevent the prohibited action by nonparties acting in concert with, or in support of, the enjoined party. (*Berger*, *supra*, 175 Cal. at p. 721 ["In matters of injunction, however, it has been a common practice to make the injunction run also to classes of persons through whom the enjoined party may act, such as agents, servants, employees, aiders, abettors, etc., though not parties to the action, and this practice has always been upheld by the courts, and any of such parties violating its terms with notice thereof are held guilty of contempt for disobedience of the judgment"].) Where a nonparty is in fact, an aider and abettor of the enjoined party, the injunction may be imposed upon that nonparty. (*Ibid.*)

We have affirmed this long-standing principle of California law before. (*Ross*, *supra*, 19 Cal.3d at pp. 908-909 [concluding that nonparties were subject to an injunction as agents of the named defendants]; *In re Berry* (1968) 68 Cal.2d 137, 155-156 (*Berry*) [recognizing that "injunctive orders to persons 'in active concert or participation with' specifically named parties defendant is approved by long-standing custom and practice"]). And federal law similarly provides that nonparties may be enjoined. The United States Supreme Court in *In re Lennon* (1897) 166 U.S. 548, 554 explained that it is immaterial whether a nonparty had notice of the application for injunction or was actually served with a copy of the injunction so long as he had actual notice of the issuing of an injunction by the court. This rule was affirmed by the United States Supreme

30

Court in *Regal Knitwear Co. v. Board* (1945) 324 U.S. 9 (*Regal Knitwear*), as cited throughout Yelp's briefs. And a federal case on which Yelp relies, *Blockowicz v. Williams* (7th Cir. 2010) 630 F.3d 563, 567 (*Blockowicz*), also explains that pursuant to rule 65(d) of the Federal Rules of Civil Procedure (28 U.S.C.), nonparties may be bound by an injunction. Yelp's contention that it may not be enjoined because it was not named as a defendant in Hassell's underlying claim is unsupported by California or federal law.

Under our precedent, an injunction may run to persons through whom the enjoined party may act, such as "persons acting in concert with or in support of the claim of the *enjoined party*, who are in fact *his* aiders and abettors." (*Berger*, *supra*, 175 Cal. at p. 721 (original italics).) As we explained in *Berger*, nonparties may be bound by an injunction where they have knowledge of the injunction, are servants or agents of the enjoined party, or act " 'in combination or collusion with them or in assertion of their rights or claims.' " (*Id*. at p. 722, quoting *Rigas v. Livingson* (N.Y. 1904) 178 N.Y. 20, 24.) Any such parties who violate the terms of the injunction "with notice thereof are held guilty of contempt for disobedience of the judgment." (*Berger*, at p. 721.) The purpose "is simply to make the injunction effectual against all through whom the enjoined party may act," thereby preventing the acts prohibited in the injunction from being carried out by other persons acting in concert with or in support of the enjoined party. (*Ibid*.) The focus is not only on proper notice to vindicate the due process rights of nonparties to whom the injunction may run, but also on whether the nonparty acted in concert with or support of the enjoined party. (See *Ross*, *supra*, 19 Cal.3d at pp. 904, 916 [upholding a judgment of contempt where the nonparty "conceded that they had received notice of the court order . . . and had knowingly voted to defy the order"]; *Berger*, *supra*, 175 Cal. at p. 723 [vacating a judgment of contempt where there

31

was "neither charge nor findings by the lower court of matters showing what amounts to a *disobedience* of the injunction by the petitioner" (original italics)].)

These concerns are also reflected in rule 65(d)(2) of the Federal Rules of Civil Procedure (28 U.S.C.). It specifies that certain nonparties, "who receive actual notice" of the injunction and are "in active concert or participation" with the enjoined party may be bound by its terms. (*Ibid.*; see *Regal Knitwear*, *supra*, 324 U.S. at p. 15 [whether an injunction may be enforced against a nonparty "depends on an appraisal of his relations and behavior and not upon mere construction of terms of the order"].) Evidentiary findings assessing a nonparty's notice and acts in concert or participation with an enjoined party may occur at a contempt hearing, when the plaintiff seeks to enforce the injunction against a nonparty. (See *Ross*, *supra*, 19 Cal.3d at pp. 903-904; *Regal Knitwear*, *supra*, 324 U.S. at p. 16.)

So *Berger*, *Ross*, and *Berry* clearly establish that California courts may enforce an injunction against a nonparty. A nonparty subject to such an injunction must not only have notice of it, but must have aided, abetted, acted in collusion with or in assertion of the enjoined defendant's rights, or otherwise acted in concert with or support of the enjoined defendant to violate the injunction.

**IV.**

The Court of Appeal affirmed the superior court's denial of Yelp's motion vacating the default judgment against Bird. In doing so, the Court of Appeal concluded that the superior court had authority under settled principles of California law to include a provision in the injunction that ordered Yelp to effectuate the injunction against Bird by deleting her defamatory reviews from its website. (*Hassell*, *supra*, 247 Cal.App.4th at p. 1355.) Relying on the superior court's observation in its order denying Yelp's motion to vacate, the Court of Appeal reasoned that California law provides that injunctions can be applied to nonparties, such as agents, servants, employees, aiders, abettors, etc. (*Ibid.*)

32

Having found no due process violation at the superior court proceedings, the Court of Appeal concluded that the superior court had the authority to issue the injunction directing Yelp to remove Bird's posts. (*Id.* at p. 1357.)

We do not believe the Court of Appeal was wrong to conclude that Yelp's degree of notice and involvement below assuaged due process concerns. By filing and appearing in the superior court to argue its motion to vacate the default judgment, Yelp initiated a proceeding through which it had opportunity to participate and be heard. The superior court considered Yelp's motion and held a hearing on August 27, 2014. In its papers and at the hearing, Yelp argued that as an interactive service provider, section 230 granted it immunity from compliance with the injunction because the reviews were provided by a third party. Yelp also availed itself of the opportunity to argue that the judgment, to the extent it was directed at Yelp, violated its due process rights as a nonparty. Yelp further asserted that Hassell did not sufficiently plead or prove their case. Specifically, Yelp argued that Hassell did not make any reasonable attempt to locate Bird before attempting service, did not prove that Bird was provided adequate notice of the action against her, and failed to submit evidence that confirmed Bird created the user accounts that authored the reviews at issue. And Yelp declared that the injunction against Bird could not bind Yelp because Hassell could not prove Yelp acted as an aider or abettor to Bird's disobedience of the injunction and it merely disregarded the injunction upon receiving a copy of the default judgment.

It is quite clear Yelp was able to participate and assert arguments against the entry of the injunction. Yelp did so at a motion to vacate the underlying judgment, without the initiation of any contempt proceedings, and after more than four months of inaction following the entry of the underlying judgment. Yelp's involvement at the hearing on the motion to vacate the default judgment, before it

33

suffered any deprivation of its rights, was functionally equivalent to participation at the entry of the default judgment.

But this due process appraisal does not merge with the separate issue of what California law requires before a court imposes an injunction on a nonparty. A nonparty may indeed be enjoined where it has notice of the injunction and acts as an aider, abettor, or in concert with or in assertion of the enjoined party's rights. Section 230 does not grant a nonparty immunity from compliance with an injunction because it functions as a website or because the injunction touches upon the website's role as a publisher. The plurality opinion attempts to characterize our explanation that the injunction could run to Yelp under longstanding principles of California law as a theory premised merely upon Yelp's awareness of the injunction and its refusal to remove the defamatory reviews. (Plur. opn., *ante*, at pp. 25-26.) This assertion is inaccurate. Rather, we recognize that a judicial finding that Yelp had notice of the injunction and aided and abetted Bird's violation of the injunction may authorize the injunction to bind Yelp. Here, the Court of Appeal expressly declined to consider the superior court's aiding and abetting determination. (*Hassell*, *supra*, 247 Cal.App.4th at pp. 1355, 1357.) Without an assessment of Yelp's actions aiding, abetting, or acting in concert or with Bird to violate the terms of the injunction, the Court of Appeal's conclusion that Yelp may be specifically directed to remove Bird's posts appears unsubstantiated. The factual determination regarding Yelp's actual notice of the injunction and its participation as an aider or abettor is necessary before the injunction against Bird may run to Yelp.

Although few existing cases find an Internet platform to have acted as an aider and abettor, a range of evidence and interactions could support such a finding. For example, Yelp cites *Blockowicz*, a Seventh Circuit Court of Appeals case, to argue that its refusal to remove Bird's posts is mere "inaction" insufficient

34

to prove it acted as an aider and abettor to Bird. We are not convinced that logic categorically protects Yelp from injunctions requiring removal of unlawful content. The *Blockowicz* court observed that the plaintiffs presented no evidence of any contact between the defendants and the website operator or manager after the injunction was issued, nor was there any indication that defendants and the employees for the website worked in concert to violate the injunction. (*Blockowicz*, *supra*, 630 F.3d at p. 568.) What the court concluded is that the record indicated the website operator and manager simply did "nothing relevant to [the] dispute" after the injunction was issued, so their "mere inactivity is simply inadequate to render them aiders and abettors" in violating an injunction directing a user to remove defamatory statements from the website. (*Blockowicz*, *supra*, 630 F.3d at p. 568.) Here, Yelp's post-injunction involvement in this case, including its legal arguments on behalf of Bird, and its litigation director's written refusal of Hassell's removal request, suggest that Yelp has gone beyond the "mere inactivity" found in *Blockowicz*. (*Ibid*.) Moreover, if we believed a court could glean no support for an aiding and abetting finding based merely on a provider's failure to remove unlawful content after receiving notice of an injunction, the sum of a provider's conduct could still amount to aiding and abetting.

By using algorithms to facilitate further distribution of the information in question to a defendant's preferred audiences, for example, or providing certain financial support to the enjoined party, the provider could take action deemed for the benefit of, or to assist, that party. (See *Arista Records, LLC v. Tkach* (S.D.N.Y. 2015) 122 F.Supp.3d 32, 36 [reasoning that active concert or participation exists where a nonparty with actual knowledge of the judicial order violated it for the benefit of, or to assist, a party subject to the injunction].) An injunction may be enforced against a nonparty service provider where the provider's services are knowingly used to facilitate the violation of an injunction.

(*Ibid.*)  A provider advancing legal arguments on behalf of the defendant or seeking to vindicate the rights or claims of the defendant may also be deemed a nonparty properly bound by the injunction against the defendant.  (See *Berger*, *supra*, 175 Cal. at pp. 721-722 [reasoning that nonparties may be bound by an injunction where they have knowledge of the injunction and act "in combination or collusion" with defendants or in assertion of defendants' rights or claims].)  Where a service provider engages in these behaviors or otherwise acts in concert with a user to spread defamatory information, it would — at best — cut sharply against section 230's underlying logic to let the provider enjoy section 230 immunity.  (*Barrett*, at p. 64 (conc. opn. of Moreno, J.) [concluding that section 230 immunity is not intended to apply where an interactive computer service provider and user are not "authentically independent" and act in concert to defame someone].)

A website's willful refusal to comply with an injunction, where compliance is feasible, may also provide evidence to support a finding that the service provider aided, abetted, or acted in concert, combination, or collusion with an enjoined defendant.  (See *Ross*, *supra*, 19 Cal.3d at pp. 904, fn. 4, 916.)  Evidence that a website prominently featured a defamatory review — to attract viewers or for other reasons — after it had notice of a defamation judgment and injunction directing the speaker to remove the defamatory post may indicate the provider has acted to violate the injunction in support of the enjoined party.  A provider's actions to maintain unlawful Internet posts in concert with a defendant may support a factual finding of aiding, abetting, or acting in concert or in support of the defendant.  So could situations where a defendant has reason to believe her content is unlawful but is encouraged by a provider to retain the content, or where a defendant attempts to remove unlawful content, but the provider retains the content citing its right to use, display, or promote the content under its terms of

service.  The plurality opinion appears to maintain in contrast that section 230 grants Yelp immunity from compliance with the injunction even where Yelp is found to have aided, abetted, or acted in concert with or support of Bird to violate the injunction.  (Plur. opn., *ante*, fn. 14 at pp. 25-26.)  We are unpersuaded. Neither the plurality opinion's logic nor its reliance upon a nonbinding federal case support the conclusion that section 230 would bar as "publication decisions" all the conduct that a trial court might rely on to make valid factual findings that action in concert or collusion occurred between a service provider and a defendant.

In its order denying Yelp's motion to vacate the defamation judgment, the superior court first cited *Ross* and *Berger* to explain how injunctions can apply to nonparties under California law.  The court then stated three factual findings with respect to whether Yelp aided, abetted, and acted in concert or with Bird in violation of the injunction.  "First, the evidence establishes that Yelp highlighted at least one of Bird's defamatory reviews about the Hassell Law Firm on its website by featuring it as a 'Recommended Review.' "  Second, the court found that Yelp asserted arguments on Bird's behalf, evidencing a unity of interest between Bird and Yelp:  "the facts indicate that Yelp is acting on behalf of Bird. Yelp moves to set aside the judgment in its entirety, including the portions of the judgment that pertain only to Bird.  Additionally, in its moving papers, Yelp argues, on behalf of Bird, that Hassell failed to establish that Bird actually posted the Yelp reviews."  Third, the court found that Yelp's refusal to delete the defamatory reviews "is inconsistent with its own terms of service, which require all Yelp.com users to 'agree not to . . . Violate our Content Guidelines, for example by writing a fake or defamatory review. . . .' "  The court found that "Yelp is aiding and abetting the ongoing violation of the injunction and that Yelp

37

has demonstrated a unity of interest with Bird" and thus denied the motion to vacate the judgment.

From the hearing transcript, it is clear the superior court heard and asked questions about the evidence of Yelp's conduct to aid, abet, act in concert with or support of Bird. These questions explored Yelp's position in its papers and at oral argument, asserting that the underlying default judgment against Bird be vacated, that Bird received insufficient notice, and that Hassell failed to prove Bird authored the defamatory posts. But the superior court's order denying Yelp's motion to vacate the default judgment does not apply the law to the facts of this case with sufficient detail. For example, the superior court's finding that Yelp acted on behalf of Bird was not accompanied by an explanation of the legal basis for the superior court's conclusion. The superior court may have reasoned that under *Berger*, Yelp may be bound by the injunction because it acted "in assertion" of Bird's "rights or claims" in presenting arguments that Hassell failed to adequately serve Bird and submitted insufficient evidence that Bird created the defamatory posts. (See *Berger*, *supra*, 175 Cal. at pp. 721-722.) Yet the order does not describe the legal authority on which the court relied to reach its determination. Similarly, the superior court may have determined that the letter issued by Yelp's director of litigation asserting that it would not comply with the injunction, although removal of the posts was feasible and authorized under its terms of service, evidenced a willful refusal to comply with the injunction that supported an aiding and abetting finding. (See *Ross*, *supra*, 19 Cal.3d at pp. 904, fn. 4, 916.) But the superior court's order does not engage in an analysis of the legal bases for its conclusion that Yelp aided and abetted Bird in violating the injunction.

Whether Yelp aided, abetted, or acted in concert with or support of Bird's violation of the injunction must be assessed using the proper legal standard for an

38

injunction to run to a nonparty, as enunciated in our precedent in *Berger* and *Ross*, and analyzed with sufficient detail. We would therefore vacate the judgment of the Court of Appeal and remand for further proceedings in accordance with the legal standard set forth in this opinion.[3]

**V.**

Our society's legal commitments balance the value of free expression and a relatively unregulated Internet against the harms arising from damaging words or private images that people are not lawfully free to disseminate. To honor those commitments in this case, we must begin by properly interpreting the evocatively-named Communications Decency Act. We must apply the relevant principles of due process that guarantee parties a right to their day in court. And we must give effect to California laws allowing injunctions to be imposed on nonparties when they are aiding and abetting unlawful conduct. No one involved in this litigation or affected by our decision today deserves anything less.

To the extent the Communications Decency Act merits its name, it is because it was not meant to be — and it is not —a reckless declaration of the independence of cyberspace. Nothing in section 230 allows Yelp to ignore a

---

[3] Justice Kruger believes remand is unwarranted to consider whether Yelp aided and abetted Bird's noncompliance with the court's order. (Conc. opn. at pp. 11-13, fn. 5 at p. 13.) Yet it is very much at issue in this case whether Yelp aided, abetted, or acted in concert with or in support of Bird. The trial court in this case made factual findings that Yelp aided, abetted, and acted on behalf of Bird — conclusions supporting its determination that Yelp may be bound by the injunction. The trial court's factual findings were based on Yelp's pre- and post-injunction conduct, including Yelp's relationship with Bird through its terms of service and as described in Bird's updated review, Yelp's legal arguments regarding Bird's claims, and Yelp's maintenance of the defamatory posts on its website. The briefs before us discuss whether the injunction was proper under California law, and whether Yelp acted in concert with Bird. Neither section 230 nor due process law fully resolve, by themselves, whether the injunction was properly issued against Yelp.

39

properly issued court order meant to stop the spread of defamatory or otherwise harmful information on the Internet. Instead the statute's terms and scheme, applicable case law, and other indicia of statutory purpose make clear that Internet platforms are not exempt from compliance with state court orders where no cause of action is filed against, and no civil liability is imposed on, the provider for its publication of third party speech. Yelp may be subject to a properly issued injunction from a California court. Where an entity had the extensive notice and considerable involvement in litigation that Yelp has had in this case, due process concerns are far less likely to impede a court from fashioning a proper injunction to prevent aiding and abetting of unlawful conduct. But whether Yelp aided, abetted, or otherwise acted sufficiently in concert with or colluded to advance Bird's defamatory conduct must be addressed using the proper legal standard for an injunction to run to a nonparty, as we explained in *Berger* and *Ross*. Because we cannot establish that the superior court made the necessary factual findings regarding Yelp's conduct in this situation, applying a legal standard consistent with the views expressed in this opinion, we would vacate the judgment of the Court of Appeal and remand for further proceedings not inconsistent with this opinion.

**CUÉLLAR, J.**

**I CONCUR:**

**STEWART, J.***

---

\*      Associate Justice of the Court of Appeal, First Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Hassell v. Bird
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 247 Cal.App.4th 1336
**Rehearing Granted**

_____

**Opinion No.** S235968
**Date Filed:** July 2, 2018
_____

**Court:** Superior
**County:** San Francisco
**Judge:** Donald J. Sullivan

_____

**Counsel:**

Aaron Schur; Davis Wright Tremaine, Thomas R. Burke, Deborah A. Adler and Rochelle L. Wilcox for Objector and Appellant.

Wilmer Cutler Pickering Hale and Dorr, Patrick J. Carome, Ari Holtzblatt and Mark D. Flanagan for Airbnb, Inc., Automattic Inc., craigslist, Inc., Facebook, Inc., IAC/InterActiveCorp, Reddit, Inc., Snap Inc., Pinterest, Inc., Thumbtack, Inc., Twitter, Inc., and Yahoo! Inc., as Amici Curiae on behalf of Objector and Appellant.

J. Joshua Wheeler; Katie Townsend, Bruce D. Brown, Gregg P. Leslie and Ariel B. Glickman for The Reporters Committee for Freedom of the Press, The Thomas Jefferson Center for the Protection of Free Expression, American Society of News Editors, Association of Alternative Newsmedia, BuzzFeed, The E.W. Scripps Company, International Documentary Association, Investigative Reporting Workshop at American University, The McClatchy Company, Media Law Resource Center, MPA – The Association of Magazine Media, National Press Photographers Association, News Media Alliance, Online News Association, Radio Television Digital News Association, Reporters Without Borders, The Seattle Times Company, Society of Professional Journalists, Student Press Law Center and Tully Center for Free Speech as Amici Curiae on behalf of Objector and Appellant.

Wilson Sonsini Goodrich & Rosati, David H. Kramer, Shelby Pasarell Tsai, Brian M. Willen and Jason B. Mollick for Google Inc., as Amicus Curiae on behalf of Objector and Appellant.

NYU Technology Law & Policy Clinic and Jason M. Schultz for Change.org, Engine, GitHub, Inc., A Medium Corporation, Patreon, Inc., SiteJabber and Wikimedia Foundation, Inc., as Amici Curiae on behalf Objector and of Appellant.

Public Citizen Litigation Group, Paul Alan Levy; Juelsgaard Intellectual Property and Innovation Clinic, Phillip R. Malone, Jef Pearlman, Daniel Chao and Erica Sollazzo for Public Citizen, Inc., and Floor64, Inc., as Amici Curiae on behalf of Objector and Appellant.

**Counsel:**

Greenberg Traurig, Ian C. Ballon and Lori Chang for Glassdoor, Inc., and TripAdvisor LLC as Amici Curiae on behalf of Objector and Appellant.

Horvitz & Levy, Jeremy B. Rosen, Scott P. Dixler and Matthew C. Samet for ACLU of Northern California, ACLU of San Diego & Imperial Counties, ACLU of Southern California, Avvo, California Anti-SLAPP Project, Electronic Frontier Foundation, First Amendment Coalition and Public Participation Project as Amici Curiae on behalf of Objector and Appellant.

University of Arizona College of Law and Jane Yakowitz Bambauer for First Amendment and Internet Law Scholars as Amici Curiae on behalf of Objector and Appellant.

Fenwick & West, Andrew P. Bridges, Tyler G. Newby, Guinevere Jobson and Armen N. Nercessian for Internet Association and Consumer Technology Association as Amici Curiae on behalf of Objector and Appellant.

Brown White & Osborn, Kenneth P. White and Evelina Gentry for Ava Bird as Amicus Curiae on behalf of Objector and Appellant.

Anette J. Beebe; Gingras Law Office and David S. Gingras for XCentric Ventures, LLC as Amicus Curiae on behalf of Objector and Appellant.

Scott & Cyan Banister First Amendment Clinic at UCLA School of Law and Eugene Volokh as Amici Curiae on behalf of Objector and Appellant.

Duckworth Peters Lebowitz Olivier, Monique Olivier and J. Erick Heath for Plaintiffs and Respondents.

Harder Mirell & Abrams, Douglas E. Mirell, Charles J. Harder and Dilan E. Esper for Erwin Chemerinsky, Valencia Corridor Merchants Association, Derik Lewis, Aaron Morris and Henry Karnilowicz as Amici Curiae on behalf of Plaintiffs and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Thomas R. Burke
David Wright Tremaine
505 Montgomery Street, Suite 800
San Francisco, CA  94111-6533
(415) 276-6500

Monique Olivier
Duckworth Peters Lebowitz Olivier
100 Bush Street, Suite 1800
San Francisco, CA  94104
(415) 433-0333